## AFFIDAVIT OF DEA SPECIAL AGENT MARK G. TULLY

I, Mark G. Tully, a Special Agent with the Drug Enforcement Administration, being duly sworn, depose and state as follows:

## INTRODUCTION

1.      I am employed as a Special Agent with the U.S. Drug Enforcement Administration ("DEA") and have been for the past 20 years.  As such, I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2.      I have been assigned to the Boston Office of the DEA's New England Division for the past 15 years.  Prior to my current assignment, I was assigned to the DEA's New York Division. Prior to my employment with the DEA, I was an officer of the United States Army for approximately three years, assigned as an Air Defense Artillery Officer at Fort Drum, New York.

3.      My primary duties at the DEA include the investigation of organized narcotics traffickers.  I have been involved in approximately 200 investigations involving the organized domestic and international importation and distribution of kilogram quantities of cocaine and heroin.  More than 25 of those investigations involved the use of court-ordered electronic surveillance.

4.      I was the affiant for Federal Title III applications in nine of those investigations. Those investigations resulted in the arrest and the prosecution of various distribution, transportation, and supply groups based in Mexico, Colombia, and the Dominican Republic and operating in the states of Massachusetts, New York, California, Ohio, Washington, Oregon, New Jersey, and Rhode Island.  Those investigations resulted in the seizure of large quantities of drugs. I have testified in the grand jury and in approximately 12 trials in the United States District Court

for the District of Massachusetts, the District of Maine, the Southern District of New York, and the Eastern District of New York.

5.      I have participated in the debriefing of dozens of defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, and executing arrests.  As a result of my assignments, I have received extensive specialized training in the field of narcotics identification and investigation.

6.      Based on my training and experience, I am familiar with the methods of operation employed by narcotics traffickers operating at the local, statewide, national and international levels, including those involving the distribution, storage, and transportation of narcotics and the collection and laundering of money that constitutes the proceeds of narcotics-trafficking activities. I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.

7.      I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.  I am familiar with the common appearance, packaging, texture and smell of the narcotics listed above.

8.      I have participated in the below-described investigation since January 2016.  I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other members of the DEA, Massachusetts State Police ("MSP"), Homeland Security Investigations ("HSI"), other federal, state, and local law enforcement agencies.  I make this

affidavit based upon personal knowledge derived from my participation in this investigation and

upon information (whether received directly or indirectly) that I believe to be reliable from

numerous sources including, but not limited to, the following:

(1)     My training and experience investigating drug-trafficking;

(2)     Oral reports, written reports, and documents that I have received from other federal, state, and local law enforcement agents;

(3)     Physical and electronic surveillance conducted by me and other federal, state, and local law enforcement officers;

(4)     Confidential sources of information;

(5)     Public and Business records;

(6)     Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

(7)     GPS tracking device data;

(8)     Drug and money seizures;

(9)     Queries of law enforcement records and intelligence databases; and

(10)    Evidence obtained from judicially-authorized intercepted communications over Target Telephones (as described below).

## PURPOSE OF AFFIDAVIT

9.      This affidavit is being submitted in support of a criminal complaint against the

following individuals:

(1)     Deiby VICTORIA;

(2)     Starling Bladmil GONZALEZ, a/k/a "Bladi" ("BLADI");

(3)     Domingo Depena VEGA;

(4)     Isidro Perez MONTERO ("ISIDRO");

(5)     Charles TORRES, a/k/a Daniel Bautista, a/k/a "Leo" ("TORRES");

(6)      Ramon ARIAS, a/k/a "Mon" ("ARIAS");

(7)      Vinicio BAEZ ("VINICIO");

(8)      Julio DIAZ, a/k/a "Alex Menan" ("Julio DIAZ");

(9)      Jefferson RODRIGZUEZ ("JEFFERSON");

(10)     Jesus SEPULVEDA, a/k/a "Juan Carlos" ("SEPULVEDA");

(11)     Santo SANTANA, a/k/a "El Viejo" ("SANTANA");

(12)     Jose ALAMO, a/k/a "Necio" ("ALAMO");

(13)     Gilberto TORRES, a/k/a "Julian" ("JULIAN");

(14)     Wellington Osnel Soto Aguasviva ("WELLINGTON");

(15)     Friman GONZALEZ, a/k/a "Gordo" ("GORDO");

(16)     Johan Montanez PIZZARO, a/k/a "Rubio" ("RUBIO");

(17)     Felix Salas DIAZ ("FELIX");

(18)     Amable DIAZ, a/k/a "Nene" ("NENE");

(19)     Wilfredo SANTANA, a/k/a "Menor" ("MENOR"); and

(20)     Hamlet Mendez Nova, a/k/a "Janle" ("JANLE"),

(collectively, the "Target Subjects") charging that beginning at least in or about February 2016 and continuing until the present, each did knowingly and intentionally combine, conspire, confederate, and agree with others known and unknown, to possess with intent to distribute and to distribute controlled substances, including heroin, a Schedule I controlled substance, cocaine, a Schedule II controlled substance, and Fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§841(a)(1) and 846.

10.     This affidavit is also being submitted in support of applications for search warrants for the following target locations, which are described in greater detail below and in attachments to the relevant warrant applications and warrants:

1) 25 Chestnut Street, Apartment 2, Saugus, Massachusetts (hereinafter, "VICTORIA's residence" or "Target Location #1");

2) 99 Glendower Road, Apartment 1, Roslindale, Massachusetts, (hereinafter, "BLADI's residence" or "Target Location #2");

3) 34  Broad Street, Apartment 24, Lynn, Massachusetts (hereinafter, the "VICTORIA DTO stash location" or "Target Location #3")

4) 270 Malden Street, Revere, Massachusetts (hereinafter, the "VINICIO's residence" or "Target Location #4");

5) Pacific Auto, 221 Hancock Street, Dorchester (hereinafter, "Pacific Auto" or "Target Location #5");

6) 12 Rock Avenue, S-1, Swampscott, Massachusetts (hereinafter, "ALAMO's residence" or "Target Location #6");

7) 41 Lindsey Street, Apartment 1, Dorchester, Massachusetts (hereinafter, "NENE's residence" or "Target Location #7");

8) 5050 Washington Street, Apartment 564, West Roxbury, Massachusetts (hereinafter, "RUBIO's residence" or "Target Location #8);

9) 111 Eliot Road, Apartment S1, Revere, Massachusetts (hereinafter, "SEPULVEDA's residence" or "Target Location #9");

10) 1000 Loring Avenue, Apartment C-91, Salem, Massachusetts (hereinafter, "JEFFERSON's residence" or "Target Location #10");

11) 24 Aberdeen Road, Unit 1, Milton, Massachusetts (hereinafter, "JULIAN's residence" or Target Location #11");

12) 161 Patriot Parkway, Revere, Massachusetts (hereinafter, "Pelon's residence" or "Target Location #12"); and

13) 108 Lowell Road, Apartment 308, North Reading, Massachusetts (hereinafter, "TORRES' residence" or "Target Location #13"),

(collectively, the "Target Locations").

11.     This affidavit does not set forth all the facts developed during the course of this investigation.  Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the Target Subjects identified herein have committed the above-described controlled substance offenses and that evidence, fruits, and instrumentalities of these offenses will be found in the Target Locations as described below.

### Summary of Evidence

### A.  *Background of the Investigation*

12.     The Boston DEA began investigating the drug trafficking activities of VICTORIA and his associates in February 2016.  The drug trafficking organization led by VICTORIA (herein, the "VICTORIA DTO") was identified through separate and ongoing DEA investigations in California and New York of a drug trafficking organization that imports narcotics into the United States from areas believed to include Mexico.  Specifically, the instant investigation began when the number for a phone used by VICTORIA was exchanged between members of a New York DTO who were arranging a money or drug pickup.  Members of the New York DTO used the BlackBerry Messenger ("BBM") application to exchange phone numbers and information prior to a money or drug pickup, and those BBM exchanges were intercepted by New York DEA agents pursuant to a federal court order.  The current investigation has used and is built upon information developed in the ongoing DEA investigations in California and New York, ongoing DEA, HSI, and MSP investigations, information provided during interviews of confidential sources and cooperating witnesses, and extensive physical and electronic surveillance of the Target Subjects.

13.     Based on the investigation to date, agents believe that the VICTORIA DTO works with other local drug traffickers, many of whom are known to law enforcement and are targets of ongoing separate investigations, to distribute large quantities of cocaine and heroin in the Boston

area.  The VICTORIA DTO is believed to obtain illegal drugs from DTOs operating in Mexico, the Dominican Republic, New York, New Jersey, Rhode Island, and Arizona.  The VICTORIA DTO is also believed to contract with money launderers to launder its drug proceeds and pay drug suppliers.

14.    The evidence against the VICTORIA DTO includes detailed and independently corroborated information from a number of confidential sources and cooperating witnesses; seizures of drugs and drug proceeds from VICTORIA and his criminal associates; information from GPS tracking devices on cars used by members of the VICTORIA DTO; location information from phones used by VICTORIA, BLADI, VEGA, ISIDRO, and TORRES;  physical and electronic surveillance of the Target Subjects; and wire and electronic communications intercepted pursuant to federal court orders.

15.    VICTORIA and BLADI have run the VICTORIA DTO as partners.  As detailed below, investigators have intercepted VICTORIA and BLADI on a daily basis discussing purchasing drugs, distributing drugs to and collecting debts from their customer base, and paying their own drug debts owed to their suppliers.  Investigators identified a number of individuals who supply drugs to the VICTORIA DTO.  VEGA both supplies and purchases cocaine from VICTORIA.  ISIDRO and TORRES both supply heroin to the VICTORIA DTO.  ARIAS has supplied heroin and cocaine to the VICTORIA DTO and to his own customer base.  VINICIO, who is VICTORIA's father-in-law, supplies heroin and cocaine to VICTORIA and BLADI and to his own customer base.  Finally, DIAZ has supplied multiple kilogram quantities of cocaine to the VICTORIA DTO.

16.    The VICTORIA DTO supplies dozens of customers with heroin, cocaine, and Fentanyl.  Among the customers identified during this investigation, JEFFERSON, SEPULVEDA,

SANTANA, ALAMO, JULIAN, and WELLINGTON stand out because they were all consistently purchasing large quantities of drugs.  As detailed below, all were intercepted over VICTORIA's or BLADI's phones purchasing drug quantities that are consistent only with distribution.

17.     BLADI and VICTORIA have employed a number of individuals who distribute drugs to and collect money from customers, including GORDO, RUBIO, FELIX, NENE, MENOR, and JANLE.  NENE and FELIX both operate livery vehicles, which are used by the VICTORIA DTO to transport drugs to customers and pick up drugs from suppliers.  GORDO, MENOR, and RUBIO also operated drug stash locations used by the VICTORIA DTO to store, package, and prepare drugs for distribution.  JANLE and FELIX assist in bringing samples of heroin and cocaine to be tested for quality and report the findings to VICTORIA and/or BLADI.

18.     Agents have identified numerous drug stash locations that members of the VICTORIA DTO maintain in Boston, Dorchester, West Roxbury, Lynn, Salem, Swampscott, and Reading, Massachusetts, and in East Providence, Rhode Island.

### B.  *Title III Electronic Surveillance*

19.     On May 18, 2016, the Honorable William G. Young, United States District Court Judge, District of Massachusetts, authorized the interception of wire and electronic communications to and from (617) 749-5049 (Target Telephone #1), which was used by VICTORIA.  The monitoring of communications over Target Telephone #1 began on May 20, 2016.  Interceptions over Target Telephone #1 expired on June 17, 2016.

20.     On June 17, 2016, Judge Young, United States District Court Judge, District of Massachusetts, authorized the continued interception of wire and electronic communications to and from Target Telephone #1, and the initial interception of wire communications to and from cellular telephone number (857) 559-3765 (Target Telephone #2"), which was used by

VICTORIA.  The monitoring of communications over Target Telephones #1 and #2 began on June 20, 2016.  Interceptions over Target Telephones #1 and #2 terminated on July 1 and 2, 2016, respectively.

21.     On July 1, 2016, the Honorable George A. O'Toole, United States District Court Judge, District of Massachusetts, authorized the continued interception of wire and electronic communications of Target Telephones #1 and #2, and the initial interception of wire and electronic communications over (857) 829-7917 (Target Telephone #3), which was used by BLADI. Interceptions over Target Telephones #1, #2, and #3 began on July 1, 2016.  Interceptions over Target Telephones #1, #2 and #3 expired on July 30, 2016.

22.     On August 3, 2016, the Honorable Richard G. Stearns, United States District Court Judge, District of Massachusetts, authorized the renewed interception of wire and electronic communications of Target Telephones #1 and #3, and the initial interception of wire communications to and from cellular telephone numbers (781) 346-1658 (Target Telephone #4), which was used by VICTORIA; (857) 210-9456 (Target Telephone #5), which was used by BLADI; and (781) 801-9536 (Target Telephone #6), which was used by VEGA.  Interceptions over Target Telephones #1, #3, #4, #5, and #6 began on August 4, 2016, and expired on September 1, 2016.

23.     On August 26, 2016, Judge Stearns authorized the initial interception of wire communications to and from cellular telephone number (857) 576-1524 (Target Telephone #7), which was used by ARIAS.  Interceptions over Target Telephone #7 began on August 26, 2016, and expired on September 24, 2016.

24.     On September 6, 2016, Judge F. Dennis Saylor IV authorized the renewed interception of wire and electronic communications to and from Target Telephones #1, #3, #4, and

#5. Interceptions over Target Telephones #1, #3, #4 and #5 began on September 6, 2016, and expired on October 6, 2016.

25.     On September 28, 2016, Judge Young authorized the renewed interception of wire communications to and from Target Telephone #7; and the initial interception of wire and electronic communications to and from (781) 526-9769 (Target Telephone #8), which was used by VICTORIA and (617) 652-6002 (Target Telephone #9), which was used by VINICIO. Interceptions over Target Telephones #7, #8, and #9 began on September 29, 2016.  Interceptions over Target Telephone #8 were terminated on October 17, 2016.   Interceptions over Target Telephones #7 and #9 expired on October 28, 2016.

26.     On October 12, 2016, Judge Young authorized the renewed interception of wire and electronic communications to and from Target Telephones #3 and #4; and the initial interception of wire and electronic communications to and from (617) 637-0585 (Target Telephone #10), which was used by TORRES; (617) 922-3959 (Target Telephone #11), which was used by ISIDRO.  Interceptions over these phones began on October 14, 2016.  Interceptions over Target Telephone #4 were terminated on October 17, 2016.  Interceptions over Target Telephone #10 were terminated on October 19, 2016.  Interceptions over Target Telephone #3 were terminated on October 28, 2016.  Interceptions over Target Telephone #11 expired on November 11, 2016.

27.     On October 28, 2016, Judge Young authorized the initial interception of wire and electronic communications to and from (719) 271-0477 (Target Telephone #12), which was used by VICTORIA; (781) 960-8323 (Target Telephone #13), which was used by BLADI; (857) 233-3445 (Target Telephone #14), which was used by TORRES; (978) 242-5898 (Target Telephone #15), which was used by GUERO; and the initial interception of wire communications over (857) 399-5706 (Target Telephone #16), which was used by VINICIO.  Interceptions over these phones

began on October 28, 2016.  Interceptions over Target Telephones #13 and #15 were terminated

on November 11, 2016.  Interceptions over Target Telephones #14 and #16 were terminated on

November 21, 2016.  Interceptions over Target Telephone #12 expired on November 26, 2016.

28.      On November 23, 2016, Judge Young authorized the continued interception of wire

and electronic communications to and from Target Telephone #12, which is used by VICTORIA;

the renewed interception of wire and electronic communications to and from Target Telephone #5,

which is used by BLADI; (857) 498-4476, which is used by BLADI (Target Telephone #17); (857)

225-9738, which is used by GUERO (Target Telephone #18);  (207) 994-9205, which is used by

ISIDRO (Target Telephone #19); and (857) 719-3397, which is used by TORRES (Target

Telephone #20).  Interceptions over Target Telephones #5, #12, #17, #18, and #20 are ongoing.

29.      On November 22, 2016, your Honor signed warrants authorizing the government

to obtain precise location information about Target Telephones #12, #13, #19, and #20 (Dkt. Nos.

16-MJ-4423 to 16-MJ-4427 and 16-MJ-4429-DHH).  On November 8, 2016, your Honor signed

warrants authorizing the government to obtain precise location information about a phone used by

Target Subject VEGA (Dkt. No. 16-MJ-4413-DHH).  A description of the investigation to date

was detailed in the Affidavits dated November 21, 2016, and November 8, 2016, in support of

those warrants, which I incorporate by reference and attach hereto (herein, "November 22

Affidavit"; and "November 8 Affidavit"), and those facts are not repeated in full in this Affidavit.

**Drug and Money Seizures**

30.      Over the course of this investigation, federal agents and task force officers have

purchased and seized approximately three kilograms of heroin from VICTORIA and one kilogram

of heroin from Angela Cordero, a courier who worked for the New York-based DTO that was

supplying the VICTORIA DTO.  Investigators have also seized over $300,000 from a money

courier who worked for the DTO that supplies TORRES and approximately $84,990 from Julio DIAZ. These seizures, along with related intercepted communications and surveillance observations, are described herein. Below, I also describe numerous intercepted calls and identify the participants in those calls. Those identifications are based on a combination of several factors, including the following: (1) intercepted statements concerning the user's location or activity that were consistent with ongoing physical or electronic surveillance; (2) identification, by name, of the users of the telephones during the intercepted communications; and (3) cell phone subscriber information. I base my interpretations of these communications upon my training and experience, the training and experience of other investigators, and my involvement in this investigation. Quotations from telephone conversations are based on preliminary transcripts and/or synopses ("line sheets") that are subject to revision. All times referenced herein are approximate.

### A.   *Drug Seizure from a Courier – Angela Cordero*

31.     On June 9, 2016, agents seized approximately one kilogram of heroin from a hidden compartment in a car being driven by Angela Cordero.[1] Cordero was transporting a kilogram of heroin from New York to Massachusetts when her car broke down on the interstate in Massachusetts. Agents monitoring VICTORIA's Target Telephone #1 intercepted BLADI telling VICTORIA that Cordero's car had broken down, and that the state police were on the scene to tow the car. Cordero, who was identified by her New York driver's license, declined to accompany police to the barracks where her car was being towed.

32.     Prior to departing the scene, Cordero told a Trooper that she was in Massachusetts visiting her boyfriend, whose name she said was Vladimir Guerrero, who she said resided at "185

---

[1] On November 30, 2016, a Boston federal grand jury returned an Indictment charging Cordero with conspiracy to possess with intent to deliver heroin.

Westville" in Dorchester, Massachusetts.  Cordero also told the Trooper that her boyfriend's phone number was (781) 219-7596; significantly, this is a phone that agents had intercepted BLADI using to talk to VICTORIA.  Moreover, BLADI and VICTORIA were using an apartment located at 184 Westville Road in Dorchester as a drug stash location at the time of the stop.  After a canine trained in the detection of narcotics alerted on Cordero's car, Troopers found and opened a hidden compartment, from which they recovered a brown plastic bag that contained a brick-shaped object, wrapped in blue duct tape, and bearing the handwritten words "Sacha Manteca" on the exterior.  The object weighed approximately 1.2 kilograms.  "Manteca" is slang for heroin, and many targets have been intercepted using the word to refer to heroin.  The DEA laboratory confirmed that the substance was heroin, with a net weight of 991 grams.  After the seizure, BLADI stopped using the phone he had used to talk to Cordero prior to the seizure and began using Target Telephone #3.

33.     Later that night at approximately 10:17 p.m. (session #2318), BLADI used Target Telephone #3 to call VICTORIA, and the call was intercepted over Target Telephone #1.  BLADI told VICTORIA, "Don't tell anything to your people.  This woman screwed up."  VICTORIA replied, "She screwed up?"  BLADI said, "Yes.  Her father called me and asked me what's wrong with me because I dropped some 'stuff.'"  VICTORIA asked why "her father" would say that, and BLADI replied, "I don't know.  She was babbling, and said I dropped something.  I said money. I told him, 'I lost some money.' . . . That woman was supposed to bring me something.  That was it."  VICTORIA told BLADI, "You have to give me the heads up in case he asks me.  He will ask me."  BLADI replied, "Just tell him you don't know.  Tell him it wasn't you.  Tell him I had the inconvenience, not you."  VICTORIA asked, "What are we going to do with the guy?  The thing owner?  The problem is that is too much of a risk."  BLADI replied, "If the stuff is good we can

keep on working." VICTORIA said that "the problem is coming down from there." VICTORIA told BLADI, "I have to change this phone [Target Telephone #1]." I believe BLADI used a new phone (Target Telephone #3) to call VICTORIA, and that BLADI changed his phone because investigators seized heroin from Cordero. I also believe that BLADI told VICTORIA that Cordero's mistake had led to the seizure ("This woman screwed up."); that BLADI complained about losing money and owing money to the people who supply drugs to the VICTORIA DTO ("I lost some money."); that VICTORIA and BLADI discussed getting heroin from a different source to avoid having to drive the heroin from New York ("The problem is coming down there."; "I wanted to talk with the guy . . . he has the stuff ready.").

**B. Investigators seized heroin and cocaine from VICTORIA.**

34.      On October 6, 2016, investigators intercepted a call between VICTORIA and BLADI in which VICTORIA told BLADI he had "three women" in his "Odyssey." The call was intercepted over Target Telephones #3 and #8. Based on prior intercepted calls between ISIDRO and VICTORIA in which VICTORIA agreed to purchase three kilograms of heroin from ISIDRO and the fact that the GPS data from VICTORIA's Honda Odyssey showed he was in the vicinity of ISIDRO's residence, investigators directed the MSP to conduct a car stop on VICTORIA's Odyssey. After a canine trained in the detection of narcotics alerted on the Odyssey, investigators searched the minivan and recovered three kilograms of heroin[2] and approximately 15 grams of cocaine from a hidden compartment inside the Odyssey. VICTORIA was told that he was stopped because the tint on his windows was too dark, and later that his registration was not proper. VICTORIA was allowed to leave without his Odyssey.

---

[2] The suspected drugs were sent to and analyzed by the DEA laboratory. The laboratory results confirmed the drugs were heroin (3,016 grams) and cocaine (14.9 grams).

35.     After the stop, VICTORIA was intercepted over Target Telephone #8 talking to BLADI and ISIDRO about the stop.  BLADI told VICTORIA not to say anything and to deny knowing anything about what as in the Odyssey.  BLADI was also intercepted telling VICTORIA that he had purchased him (VICTORIA) a new phone.  VICTORIA told his wife, Madelein Baez, that if the police found "anything" he would deny any knowledge of it and claim it must have been in the Odyssey when he purchased it.  ISIDRO asked VICTORIA if the van was registered in his name, and VICTORIA said that it was but that he had just purchased it.  ISIDRO told VICTORIA, "That belongs to people [who are] very dangerous." (session #555, intercepted over Target Telephone #8).  I believe ISIDRO meant that the heroin seized from VICTORIA was supplied by violent drug distributors.

### C.  Investigators seized $300,854 from TORRES' money courier.

36.     On November 7, 2016, investigators intercepted calls over Target Telephone #15 between TORRES and Leonel Pimentel, who is TORRES' uncle who resides in Mexico.  TORRES told Pimentel, "I'm going to try to do whatever I can to find those 300 pesos.  Don't worry.  To get that off our backs."  In subsequent calls, TORRES was also intercepted calling customers to collect money.  On November 9, 2016, investigators intercepted a call between TORRES and a man later identified as Dannie Chee, in which the men arranged to meet so that TORRES could give Chee $300,000 in drug proceeds that TORRES owed to the Mexican DTO that supplies him.  During the call, Chee asked TORRES for the "eight numbers."  TORRES read the serial number from a dollar bill and Chee replied, "The number is correct.  Okay.  I am going to see you . . . between 4:00 to 5:00, okay?"  Later that day, agents surveilled the meeting between TORRES and Chee.  TORRES was seen leaving his house carrying a bag, which he placed in his vehicle.  After meeting at a store, TORRES and Chee drove their vehicles to a side street, at which time agents

believe the exchange was made.  Chee was followed as his vehicle left the area, and he was later stopped by a MSP trooper for speeding.  The stop was ordered by DEA agents based on the intercepted calls and surveillance observations.  Troopers recovered $300,854 from two bags inside Chee's vehicle.  The money was separated into $10,000 bundles, which were wrapped in clear plastic and bound with tape.

### D.  Investigators seized approximately $84,990 from DIAZ.

37.    On November 30, 2016, investigators intercepted calls between VICTORIA and DIAZ, which indicated that DIAZ was going to collect a drug debt from VICTORIA.  DIAZ had been intercepted numerous times negotiating cocaine sales with VICTORIA, including on November 21, 2016, when DIAZ agreed to deliver five kilograms of cocaine to VICTORIA. Investigators conducting surveillance of 34 Broad Street (Target Location #3) saw DIAZ park a car outside of 34 Broad Street and enter the building.  As detailed below, Target Location #3 is a drug storage location.  DIAZ came out of the building carrying a weighted box, which he placed inside his car.  Investigators followed DIAZ after he left 34 Broad Street, and a MSP trooper conducted a traffic stop as DIAZ approached Logan airport.  The Trooper recovered approximately $84,990 from DIAZ's car.  DIAZ claimed that some of the money was his, and that the rest belonged to someone else whom he did not name.  The money was wrapped in green, plastic wrap in approximately $10,0000 bundles.

### Probable Cause

38.    This section details the various roles of the target subjects in the charged conspiracy.  It is divided into three parts:  Part I focuses on the suppliers to the VICTORIA DTO (VEGA, ISIDRO, TORRES, ARIAS, VINICIO, and DIAZ); Part II focuses on the customers of the VICTORIA DTO (JEFFERSON, SEPULVEDA, SANTANA, ALAMO, JULIAN, and

WELLINGTON); and Part III focuses on the couriers and distributors who work for the VICTORIA DTO (GORDO, RUBIO, FELIX, NENE, MENOR, and JANLE).

39.     The Target Subjects have been intercepted using lightly coded language to discuss the purchase and sale of cocaine, which they refer to as "doves," "arriba," and "white," and heroin, which they refer to as "brown," "abajo," "dirt," or "Chinese."  The Target Subjects also use the term "China" or "white" to describe heroin that is mixed with Fentanyl, which I know from my training and experience is typically light colored.  The Target Subjects also use the words "work" and "material" to refer to drugs, and "tickets" or "pesos" to refer to money.  They have also used the words "horse," "women," and "pesos" to refer to quantities of drugs.  All of the intercepted calls described below were in Spanish, and the below summaries are English translations of those calls.

I.     **VEGA, ISIDRO, TORRES, ARIAS, VINICO, and DIAZ: Drug Suppliers to the VICTORIA DTO.**

*1.   VEGA – Supplies Cocaine to the VICTORIA DTO*

40.     Based on intercepted calls between VEGA and VICTORIA and surveillance observations, I believe VEGA supplies cocaine to VICTORIA.  At times during the investigation, VICTORIA also supplied cocaine to VEGA.   VEGA was intercepted over at least three of VICTORIA's phones negotiating cocaine sales with VICTORIA.   Investigators also intercepted VEGA's phone (Target Telephone #6) between August 4, 2016 and September 1, 2016.  The calls detailed below are representative examples of the numerous calls and text messages exchanged between VEGA and VICTORIA.

**VEGA and VICTORIA negotiated a cocaine sale.**

41.     On July 22, 2016 at approximately 3:10 p.m. (session #5797), VEGA used Target Telephone #6 to exchange a series of text messages with VICTORIA.  The texts were intercepted over Target Telephone #1.

| | |
|---|---|
| VEGA: | Tell me; and those people still activated |
| VICTORIA: | Yes . . . There are a few like 5 left they told me last night |
| VEGA: | Okay I'm waiting for a call |
| VICTORIA: | Ok, You let me know |
| VEGA: | Get me 2 . . . But they need to be pretty |
| VICTORIA: | OK |
| VEGA: | . . . Is that original |
| VICTORIA: | Yes of course . . . good stuff . . . Like yours |

42.     I believe VEGA asked if VICTORIA had cocaine to purchase; that VICTORIA said he his supplier had five kilograms left ("There are a few like 5 left they told me last night"); that VEGA asked VICTORIA to buy two kilograms for him if they were high purity ("Get me 2 . . . but they need to be pretty."); and that VICTORIA assured VEGA the cocaine was high quality.

**VEGA and VICTORIA negotiated a cocaine sale.**

43.     On October 30, 2016, beginning at approximately 1:51 p.m., investigators intercepted VICTORIA and VEGA exchanging a series of calls and text messages.  All of the below calls and text messages were intercepted over VICTORIA's phone (Target Telephone #12).

| | |
|---|---|
| VICTORIA: | Okay.  He is on his way already. |
| VEGA: | 97 paine st Roslindale |
| VICTORIA: | 35min dude |

VEGA:          What is he in

VICTORIA:    Black Toyota Avalon

VEGA:          Should I send you 2 or 3

VICTORIA:    3 that will be gone right away.  Send it to me hard so I don't have to struggle
                    with that.

44.     I believe VICTORIA sent NENE (who drives a black Toyota Avalon) to pick up cocaine from VEGA at 97 Paine Street in Roslindale; that VEGA asked if VICTORIA wanted to purchase two or three kilograms of cocaine ("Should I send you 2 or 3"); and that VICTORIA told VEGA he wanted three kilograms ("3").

45.     Later that same day, at approximately 3:51 p.m., VEGA called VICTORIA.  VEGA said, "I went over that thing three times, and there are 970 pesos missing . . . there were $970 missing."  VICTORIA replied, "Let me call him then because he did that and supposedly he counted it correctly.  Let me call him."  VEGA said there were some "packets that were short."  I believe VEGA told VICTORIA that the money NENE had brought to VEGA to pay for the cocaine was $970 short.

46.     After the call ended, at approximately 3:52 p.m., VEGA sent VICTORIA a text message that read, "89030."  I believe VEGA told VICTORIA that he only received $89,030 for the three kilograms.  A few minutes later at approximately 4:01 p.m., VEGA called VICTORIA. VEGA told VICTORIA that he had "counted three times" before calling VICTORIA, but it was short $970.  VICTORIA said, "I gave him 60 pesos . . . he looked for 31 pesos around there and that's what he was organizing."  VEGA said, "We have to count the money.  It has to be counted." VICTORIA agreed, saying, "We need to do things slowly so those inconveniences do not happen."  VICTORIA and VEGA agreed to talk later.  I believe VICTORIA was supposed to

send VEGA $90,000 to pay for the three kilograms of cocaine, but that he only sent $89,030; and that VEGA called and texted VICTORIA to let him know he still owed $970.

## 2. ISIDRO – Supplies Heroin to the VICTORIA DTO

47.     ISIDRO has been intercepted over VICTORIA's phones negotiating heroin sales. As detailed above and herein, investigators seized three kilograms of heroin from VICTORIA on October 6, 2016, shortly after VICTORIA's Honda Odyssey was in the vicinity of ISIDRO's drug stash location.

## ISIDRO called VICTORIA to discuss the quality of a heroin sample and pending purchase.

48.     On October 3, 2016, VICTORIA and ISIDRO exchanged text messages and calls about the heroin that ISIDRO offered to sell to VICTORIA.  All of the below messages and calls were intercepted over Target Telephone #8.   At approximately 8:55 p.m. (session #310), VICTORIA sent a text message to ISIDRO over Target Telephone #11.   The message was intercepted over Target Telephone #8.  The message read, "Man, call me."  A few minutes later at approximately 8:58 p.m. (session #302), ISIDRO used Target Telephone #11 to call VICTORIA.  VICTORIA told ISIDRO that he had "checked that thing," and it was "much better than the last one."  ISIDRO replied, "Listen, I [can] get that for you . . . So keep checking it." VICTORIA told ISIDRO, "I've checked with three people, man.  They've all said the same thing . . . and I added four."  ISIDRO replied, "Okay.  So should we get it then?"  VICTORIA asked, "What is the price for that?"  ISIDRO said he would "investigate that."  VICTORIA replied, "The last two times it was too expensive.  You see?  And it's not good . . . There's a lot of competition." ISIDRO told VICTORIA that the "people left already" and told VICTORIA they could "give it the day" to see if it "does not go down" and they could "check it again."  VICTORIA agreed and told ISIDRO to "check it again."  ISIDRO said, "I'll ask for it tomorrow night because they are

there close.  They left me that one.  I told them 'No, no,' because I don't want to make a
commitment.  You understand? . . . They left me that one to see what's up."  VICTORIA replied,
"When can you check it . . . the color of that thing . . . that thing is strange.  It's a weird color.
Like cement."  ISIDRO acknowledged.  VICTORIA asked, "And what could that be?  But it's
good.  People have liked it.  Yes, people have liked it like the other ones.  It's much better than
the other ones."  ISIDRO asked, "You think we can sell it fast?"  VICTORIA answered, "Yes.
It'll go.  It'll go.  The other one didn't have a smell.  It didn't have color.  It was a chicken."
ISIDRO told VICTORIA, "If you want.  I'll talk to them to see the numbers."  VICTORIA
interrupted him, saying "Let's see if it benefits us, you see.  We don't want to force it because if
we force it then better not do it."  ISIDRO replied, "Let me see if we get in that then.  To resolve
that."  VICTORIA agreed.  I believe VICTORIA sent ISIDRO a text message asking him to call
("Man, call me."); that the heroin sample that VICTORIA tested was higher quality than the
heroin ISIDRO had previously sold to him ("checked that thing," and it was "much better than
the last one."); that VICTORIA asked how much the heroin would cost ("What is the price?");
that VICTORIA complained that the heroin he had previously purchased was "too expensive";
that ISIDRO said he would find out the cost ("investigate that"); that couriers were transporting
the heroin to the Boston area ("people left already"); that ISIDRO told VICTORIA to test the
heroin again to make sure it was high quality ("give it the day" to see if it "does not go down");
that ISIDRO had one kilogram of the heroin in his possession and would ask when the rest of the
heroin would be arriving ("I'll ask for it tomorrow night because they are there close.  They left
me that one."); that VICTORIA asked ISIDRO to check the rest of the heroin because the sample
that he had was an odd color ("When can you check it . . . the color of that thing . . . that thing is
strange.  It's a weird color. Like cement."); that VICTORIA agreed that he could sell the heroin

"fast" ("Yes.  It'll go."); and that ISIDRO told VICTORIA he would call the suppliers to find out how much they were going to charge for the heroin ("I'll talk to them to see the numbers.").

**ISIDRO and VICTORIA discussed the October 6, 2016 heroin seizure from VICTORIA.**

49.     As detailed above, on October 6, 2016, investigators seized approximately three kilograms of heroin from VICTORIA's Odyssey after prior intercepted calls and GPS data indicated VICTORIA was going to ISIDRO's drug stash location.  After the car stop and seizure at approximately 4:52 p.m. (session #551), VICTORIA used Target Telephone #8 to send a text message to ISIDRO over Target Telephone #11.  The message was intercepted over Target Telephone #8.  The message read, "Dude, there is a problem.  They stopped me and took my vehicle for the stupid registration."  At approximately 5:00 p.m. (session #555), VICTORIA used Target Telephone #8 to call ISIDRO over Target Telephone #11, and the call was intercepted over Target Telephone #8.  VICTORIA told ISIDRO that the police told him that they had "found something weird," and it was going to take a while to inspect the van.  VICTORIA told ISIDRO he was going to call a lawyer.  ISIDRO told VICTORIA, "Something that belongs to people so dangerous.  Oh my God!"  I believe VICTORIA told ISIDRO he was stopped because of his registration; that the police had found the hidden compartment inside VICTORIA's Odyssey and were going to search it ("they found something weird"); that VICTORIA was going to call a lawyer because he feared the police would find the heroin; and that ISIDRO told VICTORIA that the heroin belonged to dangerous drug people ("something that belongs to people so dangerous.").

### 3. TORRES Supplies Heroin to VICTORIA

50.     TORRES was first intercepted over VICTORIA's phone negotiating heroin and Fentanyl sales after Eduardo Victoria, VICTORIA's brother, told VICTORIA that TORRES would be calling.  Based on these calls, investigators believe TORRES works with Eduardo

VICTORIA to sell heroin.  Investigators have also intercepted a number of calls between TORRES and Leonel Guerra Pimentel, who is TORRES' uncle.  In 2005, Pimentel was convicted of conspiracy to distribute cocaine.  He was sentenced to five years' imprisonment and deported to the Dominican Republic.  Based on intercepted calls, Pimentel is believed to be in Mexico and working with Eduardo Victoria and TORRES to distribute heroin in Massachusetts and other places in the United States.

### TORRES negotiated the sale of heroin to VICTORIA.

51.     On September 18, 2016, beginning at approximately 12:09 p.m., VICTORIA exchanged a series of BBM messages with his brother, Eduardo Victoria, about purchasing two kilograms of heroin.  The messages were intercepted over Target Telephone #1.  During the exchange, Eduardo Victoria told VICTORIA that he had a supplier who could sell VICTORIA kilograms of heroin for $65,000 apiece.  VICTORIA told Eduardo Victoria he would purchase two kilograms if he could have a month to pay, and he gave Eduardo Victoria the phone number for Target Telephone #1 so the supplier could call him to arrange a time to deliver the heroin.

52.     After this exchange, at approximately 12:34 p.m. (session #9431), TORRES used Target Telephone #10 to call VICTORIA.  The call was intercepted over Target Telephone #1. TORRES told VICTORIA he was "calling on behalf of Edward."  VICTORIA asked where TORRES was, and TORRES said he was "by the L."  VICTORIA asked, "By the small L, or the big L?"  TORRES replied, "The big one."  VICTORIA said he would "be in the small one." TORRES replied, "Wait for me there.  Wait for me.  Send me the address."  VICTORIA agreed. I believe TORRES called VICTORIA to arrange to deliver the two kilograms of heroin that VICTORIA agreed to purchase from Edward VICTORIA ("calling on behalf of Edward"); that TORRES was in Lawrence ("by the L . . . the big one"); that VICTORIA told TORRES he would

in Lynn ("be in the small one"), which is Target Location #3; and that TORRES told VICTORIA to send him the address in Lynn where they could meet.

53. A few minutes later at approximately 12:38 p.m. (session #9432), TORRES used Target Telephone #10 to call VICTORIA. The call was intercepted over Target Telephone #1. TORRES said, "Listen, the guy is right there, dude." VICTORIA acknowledged. TORRES said, "He's around there with that girl. I'm going to knock one off, since it's right there. You understand me? And I'll do it afterwards, since it's right there." VICTORIA replied, "Alright then. It's two girls? You heard?" TORRES agreed, "So, it will be two girls." VICTORIA asked, "How much did he tell you?" TORRES said he would call VICTORIA shortly. I believe TORRES sent a courier to deliver two kilograms of heroin to VICTORIA ("the guy is right there . . . two girls"); that VICTORIA asked how much he owed; and that TORRES told VICTORIA he would call him later.

**TORRES negotiated the sale of two kilograms of heroin to VICTORIA.**

54. On September 27, 2016, at approximately 1:18 p.m. (session #9628), VICTORIA called Target Telephone #10 and spoke to TORRES. The call was intercepted over Target Telephone #1. TORRES told VICTORIA that a "guy" had called him. VICTORIA asked, "Do you have any of that?" TORRES told VICTORIA there were "two left" and that he had "saved one" for someone. VICTORIA told TORRES, "Let's do it different, because there are, there are some people who want some, right? . . . I'm going to give from what you brought me last time. I'm going to give them a little piece to see what he says. To see if he takes what we have." VICTORIA told TORRES, "These are new people. They want a whole one." TORRES replied, "You let me know if you want me to get it to you, because the guy is going out around there so he only has to go out once." VICTORIA told TORRES, "It's better to just give him a piece of

the last one that you brought me." TORRES agreed. I believe that a customer of VICTORIA's called TORRES to purchase a kilogram of heroin ("They want a whole one."); TORRES told VICTORIA he had two kilograms of heroin left on hand ("two left") but he was saving one for another customer; that VICTORIA planned to give the customer a sample of the heroin he had on hand ("I'm going to give from what you brought me last time . . . To see if he takes what we have."); TORRES told VICTORIA to let him know if he needed heroin so TORRES's courier could deliver it to VICTORIA ("You let me know if you want me to get it to you, because the guy is going out around there so he only has to go out once."); and VICTORIA said he would sell the customer heroin that he had previously purchased from TORRES ("It's better to just give him a piece of the last one that you brought me.").

### **TORRES inquired about a drug debt and discussed a heroin sale with VICTORIA.**

55.     On October 3, 2016, at approximately 6:10 p.m., TORRES used Target Telephone #10 to exchange a series of text messages with VICTORIA. The messages were intercepted over Target Telephone #1.

| | |
|---|---|
| TORRES: | Hey . . . How are you |
| VICTORIA: | What's up man |
| TORRES: | Are you around here already? |
| VICTORIA: | What's up. I don't understand. |
| TORRES: | You told me that you were going to leave |
| VICTORIA: | Oh yes |
| TORRES: | You don't have anything for me |
| VICTORIA: | Man, I already gave you 900 and change of the first one |
| TORRES: | Who did you give them to |

56.     I believe TORRES asked if VICTORIA had money to pay for the drugs he had purchased on consignment ("You don't have anything for me"); that VICTORIA said he had already made a partial payment ("Man, I already gave you 900 and change of the first one"); and that TORRES asked to whom VICTORIA had sent the money ("who did you give them to").

57.     A few minutes after the text message exchange above, VICTORIA used Target Telephone #1 to call Target Telephone #10 (session #9786).  The call was intercepted over Target Telephone #1.  TORRES asked, "Who did you give that to?  Because no one has reported to me." VICTORIA replied, "To the guy who . . . because I don't know you . . . The guy who sent me to give . . . The one I spoke with to get that stuff."  TORRES asked, "But do you know who's speaking to you?"  VICTORIA replied, "No. I don't know who's speaking.  Who's speaking?" TORRES replied, "Leo . . . The one you returned the first one to.  Do you remember?  That there were two, and you returned one."  VICTORIA responded, "Yes, I know who I'm speaking with, but what I'm saying is that I haven't done business with you.  I'm doing business by means of some other person to whom I sent 8,750 pesos for . . ."  TORRES interrupted, saying "No." VICTORIA replied, "Man, you guys need to be in agreement so I can know who I am going to give it to so there is no misunderstandings, you know what I mean?"  TORRES agreed and said, "Yeah, but hold on.  I think you sent it to someone else by mistake, because it was not to me nor the person that . . ."  VICTORIA replied, "No.  I'm not saying it was you.  I'm referring to the person I speak with to make orders.  I don't know.  I spoke with someone who referred me to that other person who is supposed to give me the stuff.  It's that person I'm referring to. You know what I mean?"  TORRES replied, "Well, I'll call you back.  Let me clarify that because no one has sent anything more."  I believe TORRES asked VICTORIA who he had paid ("Who did you give that to?  Because no one has reported to me."); that VICTORIA said he paid the person

(Edward VICTORIA) who had sent him the drugs ("The guy who sent me to give . . . The one I spoke with to get that stuff."); that VICTORIA told TORRES he had already sent $8,750 ("I sent 8,750 pesos"); that TORRES questioned whether VICTORIA sent money to the right person ("I think you sent it to someone else by mistake, because it was not to me nor the person that . . ."); and TORRES said he would check because he had not received payment ("Let me clarify that because no one has sent anything more.").

58.     After the call, TORRES used Target Telephone #10 to exchange a series of text messages with VICTORIA over Target Telephone #1.

| | |
|---|---|
| TORRES: | I think you are confused man |
| VICTORIA: | Man how much do I owe you |
| TORRES: | It's in total of 2 |
| VICTORIA: | Exactly |
| TORRES: | 124 |
| VICTORIA: | They told me 61 |
| TORRES: | Okay let me find out about that . . . Listen, there is something different . . . I don't know if it's synthetic . . . If you want I will send you a photo . . . I don't know how to identify them when they are regulars or when they are synthetic |
| VICTORIA: | I don't like the synthetic one, it falls quickly . . . Of the other one I'm getting rid of little by little because not everybody has liked it |
| TORRES: | Which one do you like . . . This one doesn't go down at all. |
| VICTORIA: | The yellowish one that you sent me but original, that one has been touched. |
| TORRES: | No that one hadn't been touched . . . I'm going to check because I think there's some of those but of different ones |
| VICTORIA: | Man I explained to you how I get it, I add 100 to 100, and to the one I give it to, he adds 5 and that has to pass well for him. That one |

|  | alone is passing at 5, imagine that, I am doing it for the points . . . That's not good for me, you understand me . . . It's more of a risk that anything |
|---|---|
| TORRES: | I am going to see if I received more in package . . . Different |
| VICTORIA: | Look I will check it, if it's better I will get you out a lot and quickly because when it's low it takes too long |
| TORRES: | Okay bro |

59.      I believe TORRES told VICTORIA he owed $124,000 for two kilograms of heroin that VICTORIA had purchased on consignment ("It's in total of 2"; "124"): that VICTORIA said he was quoted a price of $61,000 per kilogram ("They told me 61"); that TORRES offered to sell VICTORIA more drugs which were either heroin or Fentanyl ("Listen, there is something different . . . I don't know if it's synthetic . . . If you want I will send you a photo"); that VICTORIA did not want to purchase Fentanyl ("I don't like the synthetic one, it falls quickly"); that VICTORIA wanted the heroin that was not already diluted ("The yellowish one that you sent me but original, that one has been touched."); that VICTORIA dilutes the heroin he buys ("I add 100 to 100") before reselling it to make money ("points"); and that TORRES was going to check if he had the heroin VICTORIA preferred ("I am going to see if I received more.").

**TORRES and Pimentel discussed paying down their drug debts.**

60.      On November 7, 2016, at approximately 12:33 p.m. (session #259), TORRES called Mexican phone number 5216971113221 and spoke with his uncle, Leonel Pimentel.  The call was intercepted over Target Telephone #14.  TORRES told Pimentel, "Juan told me he doesn't have anything . . .  That maybe for this week.  God willing.  But my friend will hit me up one later, you get me?  Later, at night, he told me.  I think that we should be able to complete 260."  Pimentel told TORRES to "go and see."  TORRES replied, "Seriously . . . with that we will be able to take it easy for at least ten more days."  Pimentel replied, "Of course.  That's what

I want.  No, alright, go and see, go and see.  Do as much as possible."  TORRES told Pimentel he was going to "take some pants at 32," and that the pants "look pretty big."  Pimentel replied, "Well, see to it."  TORRES continued, "I'm going to see Jose Luis at night, because I have to pass by Edgar's . . . to also bring him a photo because he told me that he is going to get it like that.  I will tell him we are going to give it to him like that right?  But I put it to him at seven . . . We will give it to him like that, but I told him it's at 67."  Pimentel agreed.  TORRES said, "I'm going to try to do whatever I can to find those 300 pesos.  Don't worry.  To get that off our backs."   Based on intercepted calls, I believe Pimentel is TORRES' uncle and is in Mexico.  I believe TORRES told Pimentel that he talked to JUAN about collecting money ("Juan told me he doesn't have anything . . . That maybe for this week."); that TORRES believed he could collect $300,000 from their drug customers to pay off their drug debts ("I'm going to try to do whatever I can to find those 300 pesos.  Don't worry.  To get that off our backs."); that TORRES planned to purchase kilograms of cocaine for $32,000 apiece ("take some pants at 32"); and that TORRES planned to bring a heroin sample to a customer and that he was going to sell the heroin for $67,000 a kilogram ("have to pass by Edgar's . . . to also bring him a photo because he told me that he is going to get it like that . . . I told him it's at 67.").

**TORRES arranged a money delivery to pay down a drug debt.**

61.    On November 9, 2016, at approximately 11:38 a.m. (session #375), TORRES received a call from (646) 641-7513, and spoke with Dannie Chee.  The call was intercepted over Target Telephone #14.  Chee said, "Hey buddy!  Um, you did not text me the code.  You know the, the number.  The eight numbers."  TORRES asked, "Eight numbers?"  Chee replied, "Yeah, the boss told you to get the dollar bill . . . just text me the code.  Let me make sure, okay?"  Chee said, "Just tell me the last four."  The call ended, and a few minutes later TORRES called Chee.

Chee said that the "code is not clear."  TORRES agreed, and gave the number, "811098783K."

Chee read the number back, and TORRES agreed.  Chee said, "The number is correct.  Okay.  I

am going to see you . . . between 4:00 to 5:00, okay?"  TORRES agreed.  I believe Chee is a

money courier who picks up drug debts for the organization that supplies heroin to TORRES; that

Chee asked TORRES for a code which was established by the drug suppliers ("You did not text

me the code.  You know the, the number.  The eight numbers."); that TORRES gave Chee the

code ("811098783K"), which is believed to be the serial number from a bill; and that after

confirming the code, Chee planned to meet TORRES to collect the drug proceeds.

62.     As detailed above, on November 9, 2016, after intercepting calls between TORRES

and Chee, in which TORRES and Chee arranged to meet so that TORRES could give Chee

$300,000 in drug proceeds, investigators surveilled the meeting between TORRES and Chee.

Chee was followed after the meeting and later stopped by a MSP trooper for speeding.  The stop

was ordered by DEA agents based on the intercepted calls and surveillance observations.

Troopers recovered $300,854 from two bags inside Chee's vehicle.  The money was separated

into $10,000 bundles, which were wrapped in clear plastic and taped.  I believe the money was

drug proceeds based on the investigation to date, the intercepted calls, and how the money was

packaged.

**TORRES discussed the quality of heroin with a customer.**

63.     On December 1, 2016, at approximately 1:33 p.m.  (session #197), TORRES

received a call from a man named "Chupe."  TORRES asked, "Nothing at all?"  CHUPE replied,

"Not yet, for the weekend."  CHUPE told TORRES, "That thing.  I don't know.  I took 100 pesos

to the guy and he said it wasn't great but it's working for him.  He's going to call me today to

give him the rest that's there.  And the other one that you had there, did you give it away?  Just in

case." TORRES replied, "That's there. I told you that I was going to have it for you. Didn't I tell you that?" CHUPE agreed, saying, "Yes, because I don't like that one too much. I like it wet. He's a bit more complicated. He's going to decide later . . . but this week I'll contact you because my cousin called me." TORRES replied, "Okay. There is some of the first one." CHUPE said he would call TORRES to let him know. I believe Chupe is one of TORRES' drug customers; that TORRES asked if Chupe had money to satisfy his drug debt ("Nothing at all?"); that Chupe said he would have money by the weekend ("Not yet. For the weekend."); that Chupe told TORRES he had sold 100 grams of heroin to a customer and that the customer may want to purchase more ("I took 100 pesos to the guy and he said it wasn't great but it's working for him. He's going to call me today to give him the rest that's there."); that Chupe asked if TORRES had heroin from a different source ("And the other one that you had there, did you give it away? Just in case."); that TORRES confirmed he still had heroin available from a different source ("That's there. I told you that I was going to have it for you."; "There is some of the first one."); that Chupe said he preferred the heroin to be "wet" but that his customer was "more complicated."; and that Chupe told TORRES his "cousin" wanted to purchase heroin.

### 4.   *ARIAS – Supplies Heroin and Cocaine to VICTORIA*

64.   ARIAS was intercepted over VICTORIA's phone negotiating drug deals with VICTORIA. Investigators intercepted ARIAS' phone (Target Telephone #7) for approximately 60 days. During that time, investigators intercepted ARIAS fielding calls from his couriers and directing them to deliver heroin and cocaine to his customer base. The calls detailed below set forth VICTORIA's relationship with ARIAS and demonstrate ARIAS' drug dealing activities.

**July 22, 2016:  VICTORIA ordered cocaine from ARIAS.**

65.     On July 22, 2016 at approximately 1:05 p.m. (session #5740), VICTORIA called (617) 980-0082 and spoke to ARIAS. The call was intercepted over Target Telephone #1. VICTORIA told ARIAS, "Listen . . .  I'm going to send a guy there."  ARIAS replied, "Okay. Give me a second, wait."  VICTORIA asked, "At how much are you going to sell me that?" ARIAS replied, "At 70 pesos . . . they gave it to me at that exact."  VICTORIA agreed.  ARIAS said, "You can add a little thing, because it's good."  VICTORIA asked, "Are we going to fix all the account?"  ARIAS agreed.  VICTORIA replied, "Let me see.  Wait a second.  How much is the total?  It's 15,700 . . . so divide that and send me that in work then."  ARIAS agreed. VICTORIA asked, "How are you with the white stuff from below?"  ARIAS replied, "I'm checking that right now, and see what's up."  VICTORIA said, "I'm getting some stuff . . . I will send you five.  Do me that favor."  ARIAS agreed and asked, "In how long are you sending me the guy?"  VICTORIA said he would "send him."  I believe VICTORIA was buying a kilogram of heroin from ARIAS for $70,000 ("At 70 pesos . . . they gave it to me at that exact."); that ARIAS told VICTORIA the heroin was high quality and could be diluted to increase the profit on resale ("You can add a little thing, because it's good."); that ARIAS owed VICTORIA $15,700 from drugs ARIAS had previously bought from VICTORIA on consignment; that ARIAS was going to pay down the debt by reducing the price he charged VICTORIA for the heroin ("divide that and send me that in work then."); and that VICTORIA told ARIAS he was going to send him some heroin mixed with Fentanyl ("white stuff from below") for ARIAS to sell ("I'm getting some stuff . . . I will send you five.  Do me that favor.").

**August 12-13, 2016: ARIAS and VICTORIA discuss purchasing heroin and cocaine**.

66.     On August 12, 2016, at approximately 2:30 p.m. (session #7298), VICTORIA used Target Telephone #1 to call Target Telephone #7 and speak to ARIAS.   The call was intercepted.  ARIAS told VICTORIA, "I was "waiting for your call."  VICTORIA said, "The stuff you sent me that time – do you have some more of that?"   ARIAS replied, "I have to check how much I have left."   VICTORIA said, "Because the guy I gave that thing to is almost gone.  He said that he wants the same stuff, otherwise he won't take anything."  ARIAS said, "Is good stuff buddy."  VICTORIA agreed, "Very good."   ARIAS said he did not know "how much is left" but he would "ask the people if they have some."  VICTORIA replied, "I needed about 300."   ARIAS said, "I'll let you know.  Give me an hour so I come down from the field."   VICTORIA agreed. I believe VICTORIA called to purchase more heroin from ARIAS ("The stuff you sent me that time.  Do you have some more of that?"); that VICTORIA's customer insisted on the same heroin that VICTORIA had previously purchased from ARIAS ("He said that he wants the same stuff, otherwise he won't take anything."); that the heroin was high quality ("Is good stuff buddy."); and that VICTORIA wanted to purchase 300 grams of the same heroin from ARIAS ("I needed about 300.").

67.     The following day on August 13, 2016, at approximately 3:05 p.m. (session #7448), ARIAS used Target Telephone #7 to call VICTORIA. The call was intercepted over Target Telephone #1.  VICTORIA noted that ARIAS had not called him the previous day.  ARIAS said he "checked and called some people" but they did not have "any."  VICTORIA said he wanted a "whole one this time," and that he could "give the money in twenty days."   VICTORIA told ARIAS he could pay some money "up front."   ARIAS said he would call and let VICTORIA know what could be done.  ARIAS told VICTORIA he had a "photo of something that's very

good."   ARIAS asked about the "white stuff," and VICTORIA said he did not need the "white stuff" because he had "a lot of that stuff there."   I believe VICTORIA wanted to purchase a kilogram of heroin ("a whole one") from ARIAS' supplier (he "checked and called some people"); that VICTORIA wanted to pay for a portion of the kilogram upon delivery ("up   front"),     and pay the balance in "twenty days."  I also believe that ARIAS told VICTORIA he had a sample of high quality cocaine ("photo of something that's very good"; "white stuff"); but that VICTORIA did not want to purchase cocaine because he already had some (he has "a lot of that stuff").

68.     Later that evening at approximately 5:27 p.m. (session #7482), VICTORIA used Target Telephone #1 to call Target Telephone #7 and speak to ARIAS.  VICTORIA told ARIAS, "My brother has stuff available for seven."  ARIAS said he would call VICTORIA back.  I believe VICTORIA told ARIAS that VICTORIA's brother, Eduardo Victoria, had heroin for sale at $70,000 a kilogram.  I believe VICTORIA was referring to heroin based on the price quoted ("seven").

69.     Later that night at approximately 8:49 p.m. (session #7506), ARIAS used Target Telephone #7 to call VICTORIA on Target Telephone #1.  ARIAS said he was "struggling with the money" and told VICTORIA to call his "brother."  VICTORIA agreed and put ARIAS on speaker phone while he dialed a number using a different phone.  VICTORIA told ARIAS his brother was not answering.  ARIAS asked VICTORIA to call him if he heard anything.  I believe ARIAS did not have the $70,000 to purchase the kilogram of heroin that VICTORIA's brother was trying to sell, and that VICTORIA tried calling his brother to ask if ARIAS could purchase the heroin on consignment.

70.     Later that night at approximately 9:01 p.m. (session #7510), VICTORIA used Target Telephone #1 to call Target Telephone #7 and speak to ARIAS.  The call was intercepted

over Target Telephone #1.  VICTORIA told ARIAS, "He said yes for early on Monday."  ARIAS asked, "Are you stopping by, or will [you] send the guy?"  VICTORIA replied, "Damn.  I have some people waiting man.  I have to see them urgently.  I will take half an hour to see him.  I will waste a half hour going to Revere.  I'll waste time going to see you."  ARIAS replied, "Okay. Finish that, then tell me where you are, and I can stop by."  VICTORIA told ARIAS, "Give it to me on Monday."  ARIAS replied, "I'll be in my house.  Call me any time.  I'll see you." VICTORIA confirmed, "So you'll send somebody to the business on Monday?"  ARIAS affirmed, and VICTORIA said, "I'll tell them to have it ready for you on Monday."  I believe VICTORIA told ARIAS that his brother agreed to sell ARIAS the heroin ("He said yes for early on Monday"); that ARIAS planned to pay for some of the heroin upfront ("Are you stopping by or will send the guy"); that VICTORIA told ARIAS to bring him the money on Monday ("Give it to me on Monday"); and that ARIAS was going to pick up the heroin on Monday, August 15, 2016 ("I'll tell them to have it ready for you on Monday.").

### ARIAS negotiated a heroin purchase.

71.     Beginning on October 6, 2016, ARIAS exchanged a number of calls with an unidentified male who uses telephone number (978) 304-6628 (UM6628).  Based on these calls and the investigation, I believe UM6628 is one of ARIAS' heroin suppliers.  On October 6, 2016, at approximately 12:30 p.m., ARIAS called UM6628, and the call was intercepted over Target Telephone #7.  UM6628 told ARIAS, "I'm calling this girl, and she's not answering.  To head over that way . . . How should we do this then?"  ARIAS said he would meet with UM6628 at 3:00.  ARIAS told UM6628, "I have it here, but now I'm going to go out to . . . see some people . . . Maybe I can go by that way."  UM6628 told ARIAS he was on the corner near Huntington Avenue.  ARIAS replied, "Let me see because I have a couple people who are getting desperate."

The following day at approximately 7:59 p.m., ARIAS called UM6628 and the call was intercepted over Target Telephone #7.  UM6628 told ARIAS, "I was going to call you, but I didn't want to talk from this one, just in case . . . There aren't any problems but it was the brother-in-law.  I don't want to . . . but I had a big problem.  You know that the brother . . . Well I am going to explain you something.  Listen, I'm going to give you something later, but what happened is that the guy over there is going down from the capital."  ARIAS asked, "They are going down from the capital to over there?"  UM6628 replied, "Yes, yes.  That is why I haven't called you, because I just called and they are at the capital."  ARIAS told UM6628, "Call them now so you can all agree, because I think that he is at the Capital."  UM6628 said that a girl told him "he" was in Bani.  UM6628 said that the "guy was at the Capital . . . resolving something" and they only have "nine."  UM6628 told ARIAS, "He told that they were going to give it to me today, but they are coming down from the Capital."  ARIAS replied, "Call the guy anyways so they can agree."  UM6628 told ARIAS not to call the guy, and ARIAS agreed.  Based on these and other intercepted calls, I believe UM6628 was waiting for a female courier who works for ARIAS to deliver money that ARIAS owed; that ARIAS told UM6628 he would bring the money himself after he delivered drugs to his customers ("I have it here, but now I'm going to go out to . . . see some people"); that UM6628 told ARIAS that a supplier in the Dominican Republic had  nine kilograms of heroin to sell ("guy was at the Capital . . . resolving something"; they have "nine"); that ARIAS told UM6628 to call the supplier and arrange to purchase the drugs; and that UM6628 told ARIAS that he would call but ARIAS should not.

**ARIAS asked about the heroin seizure from VICTORIA.**

72.     On October 7, 2016 at approximately 9:00 p.m., ARIAS received an incoming call from (617) 816-7049, and spoke with a woman named Yinsy.  ARIAS told Yinsy, "Listen.  You

heard that Deiby had problems?"  Yinsy replied, "It's a lie.  I already spoke with him."  ARIAS asked, "It's a lie?"  Yinsy replied, "Yes.  I just spoke with him just now.  That's why I called him, because they had told me that."  ARIAS said he had heard about what happened from someone else.  ARIAS said he would call Yinsy back.  I believe ARIAS asked about the heroin that was seized from VICTORIA ("Deiby") on October 6, 2016; that Yinsy said she had spoken to VICTORIA; and that whatever ARIAS had heard was not true ("It's a lie").

### 5. *VINICIO – Distributes Heroin and Cocaine*

73.    During this investigation, investigators have intercepted two phones used by VINICIO to conduct his drug business.  VINICIO was also intercepted using numerous other phones to discuss drug sales with VICTORIA and BLADI.  VINICIO is VICTORIA's father-in-law, and the uncle to BLADI's girlfriend (Wilcania Baez).  As the calls detailed below indicate, VINICIO sells both heroin and cocaine to VICTORIA, BLADI, and his own customer base.

**VINICIO met with BLADI to deliver a drug sample.**

74.    On August 17, 2016, at approximately 1:10 p.m. (session #4093), VINICIO called BALDI and told him, "Pass by here."  BLADI said he was working and would come later.  VINICIO said, "I will have this over here, you heard? The sample."  BLADI said he would see him there.  I believe VINICIO told BLADI to pick up a sample of drugs.

**VINICIO took a drug order from a customer.**

75.    On October 6, 2016, at approximately 12:00 p.m. (session #255), VINICIO called (857) 999-1264, and spoke with an unidentified male (UM1264).  UM1264 told VINICIO, "My friend was telling me it looks like he found it high and went elsewhere, because he didn't call me back."  UM1264 said his "friend from Brockton wants two palomas, and he has the papers and he's willing to come up to pick them up."  UM1264 said he needed "one" for himself also.

VINICIO said it was fine and to call him so he could have all three together.  I believe UM1264 asked to purchase two ounces of cocaine ("two Palomas") for his drug customer ("friend from Brockton"); that the customer had the money to pay for the drugs upfront ("he has the papers"); and that UM1264 also wanted to purchase cocaine ("one") for himself.

### BLADI called VINICIO to discuss the quality of heroin.

76.     On November 11, 2016, at approximately 4:32 p.m. (session #572), BLADI used Target Telephone #17 to call VINICIO, and the call was intercepted over Target Telephone #16. BLADI identified himself in the call by saying he was "Wilson's son."  Based on the investigation, I know that Wilson Baez is Wilcania Beaz's father and BLADI's father-in-law.  BLADI said, "It's me, your son . . . Wilson's son."  BLADI said he had "bad news."  VINICIO asked, "Tell me how did it go?"  BLADI replied, "It didn't go well per se, but I have bad news on that one and good news on the other one."  VINICIO asked what the "good news" was.  BLADI replied, "That I didn't mess up that trip, because I doubted it at once . . . And I didn't mess it up.  Yes, it is all inside of it and all that, and I took a little bit today, you know?  I chopped it a bit.  I don't want to talk much . . . Like one something.  You understand me?  You know?  But don't worry for that because I will resolve that . . . it has from yours."  VINICIO asked if it was "mixed."  BLADI replied, "Yes, a lot of stains . . . It would be good if you should see it."  VINICIO asked, "And the other one, is he going to check it?"  BLADI replied, "Imagine.  Take some out yourself, so I can go and get it then . . . five or three."  BLADI continued, saying, "You can imagine how I have my head on the street when I brought that.  It was all fucked man."  BLADI said he would talk with VINICIO "there" and VINICIO told him to "head here."  I believe BLADI called VINICIO to tell him that he had tested two samples of heroin ("I have bad news on that one and good news on the other one."); that BLADI had used some heroin VINICIO had purchased to mix it with

heroin from a different source ("I chopped it a bit"; "it has from yours"; "a lot of stains"); that VINICIO asked if the heroin from the different source had also been tested ("And the other one, is he going to check it?"); and that BLADI suggested that VINICIO have the heroin tested himself ("Take some out yourself, so I can go and get it then . . . five or three.").

77.     Later that same day, at approximately 5:19 p.m. (session #573), BLADI again used Target Telephone #17 to call VINICIO, and the call was intercepted over Target Telephone #16. VINICIO greeted BLADI saying, "Tell me, nephew." BLADI told VINICIO not to leave because he was "heading with that." VINICIO said he would wait. I believe VINICIO identified BLADI as his nephew ("tell me nephew"); and that BLADI told VINICIO he was bringing him the heroin sample to test as they had discussed in the earlier call ("heading with that.").

78.     Later that evening at approximately 6:25 p.m., VINICIO called Target Telephone #17 and spoke to BLADI. The call was intercepted over Target Telephone #16. VINICIO asked, "It is going to be checked tomorrow in the morning, right?" BLADI confirmed. VINICIO said, "Alright, so you call me. I will tell him that tomorrow it's going to be checked." BLADI agreed. I believe VINICIO called BLADI to confirm that BLADI was going to have the heroin sample tested the following morning ("It is going to be checked tomorrow in the morning, right?").

79.     On November 12, 2016, at approximately 3:35 p.m. (session #593), VINICIO called Target Telephone #17 and spoke to BLADI. The call was intercepted over Target Telephone #16. VINICIO asked if BLADI had called him from a different number, and BLADI said he had called from "this one." BLADI said, "Yes, because yesterday you called me from a different number. I have two different numbers here." VINICIO told BLADI to use "this one." BLADI asked, "What did you do?" BLADI said, "I fixed a thing that I had there, but for this week I'm going to need. Are you active?" VINICIO affirmed. I believe BLADI told VINICIO

he had two phones ("I have two different numbers here"), which I believe are Target Telephones #5 and #17 based on the intercepted calls; that BLADI told VINICIO he had mixed some heroin to make it more potent ("I fixed a thing that I had there.") and that BLADI asked if VINICIO could either supply him with drugs or money ("I'm going to need.  Are you active?").

80.      Later that day, at approximately 4:59 p.m., BLADI used Target Telephone #17 to call VINCIO over Target Telephone #16.  BLADI told VINICIO, "The one that you have there, it is not good nor bad.  It passes for me, but for me to sell it like that, can't touch that.  Therefore, tell the owner what I told you, it's up to you."  VINICIO replied, "No, no.  It's for me to know, do you understand? . . . He sent it for you to check it."  BLADI said, "I didn't add anything because I was already skeptical.  I have it just like that, and the kid only added a three . . . So if I add anything I'll ruin it.  Nothing can be added to that.  That's to be sold at three."  VINICIO agreed and asked, "They have brought down the other piece?"  BLADI said, "No, no, they haven't brought it down.  I haven't been around there today.  I haven't gone.  I'll bring it down for you."  VINICIO disagreed, saying "I don't know how much is there to tell him how much was taken."  BLADI said, "I'm not going to Providence today."  VINICIO replied, "No, if you knew how much you gave him, I could tell him. 'Well this much is missing.'"  VINICIO told BLADI, "I can tell him whatever buddy.  If he says it's missing . . . if they say this much, then we are going to have to pay what's missing."  BLADI replied, "No buddy, because we are going to give it all back the same.  What's more, let me see if I can send this kid to pick up that shit."  VINICIO disagreed, and BLADI said he would "give it back tomorrow."  VINICIO said the "guy was going to pick that up today."  BLADI said he did not have time to go to Providence.  BLADI and VINICIO agreed to talk in person at a party they were both attending.  I believe BLADI reported that the heroin he had tested was fine but could not be diluted further ("The one that you have there, it is

not good nor bad.  It passes for me, but for me to sell it like that, can't touch that."; "Nothing can be added to that."); that VINICIO planned to return the heroin and asked if BLADI had taken any of heroin from what had been purchased ("I don't know how much is there to tell him how much was taken."); and that BLADI told VINICIO he planned to return all of the heroin (""No buddy, because we are going to give it all back the same.  What's more, let me see if I can send this kid to pick up that shit.").

81.    On November 14, 2016, at approximately 1:11 p.m. (session #659), BLADI used Target Telephone #17 to call VINICIO.  The call was intercepted over Target Telephone #16. VINICIO told BLADI, "We are good.  Yes, they took it already."  BLADI acknowledged, and VINICIO told him not to "worry."  I believe BLADI told VINICIO that he had someone return the heroin that they had purchased ("We are good.  Yes, they took it already.").

### BLADI discussed the quality of drugs he ordered from VINICIO.

82.    On December 2, 2016, at approximately 11:18 a.m., VINICIO called BLADI, and the call was intercepted over Target Telephone #17.  BLADI said, "Buddy, you told me with the four, and I hit it with the three . . . It's not like he says.  And what is the price?"  VINICIO replied, "Oh.  It's not like it should be then."  BLADI said he planned to sell it so his "people can add a two and a half."  VINICIO replied, "He told me it was not a five but that it was at a four."  BLADI said he was going to call "another one."  VINICIO replied, "Yes, figure it.  I'm already here at the dealer."  I believe BLADI complained about the quality of heroin he purchased from VINICIO ("I hit it with the three . . . It's not like he says."); that BLADI wanted the heroin to be potent enough that his customers could dilute it further before redistributing it ("people can add two and a half"); and that VINICIO told BLADI he was at "the dealer," which is Target Location #5.

83. Later that morning at approximately 11:47 a.m., BLADI called VINICIO back. BLADI told VINICIO, "I was dealing with that since early, and I told you that I picked up yesterday what you gave me. And I even picked it up with a brush. Every single crumble to be able to complete something for a guy. And you know my situation, so I want to see if this guy . . . because the reality is that it is not convenient for me. That's just in case I get a call for 50 or 100." VINICIO replied, "I know that guy works fine because I have grabbed from him before . . . Yesterday I saw another guy as well. A guy I had not seen in a while . . . and I told him, 'Send me a sample,' and he told me, 'No, I'm going to send you 400.'" BLADI asked, "So what should I do? Go there and buy some food and wait there? Because you know I can't be this way. Today is Friday and tomorrow Saturday." VINICIO replied, "Listen to me. You know that sample that they brought me? The guy lives around there in Lynn, and I have to call him to bring it down. But come over here and we will talk in person." BLADI asked VINICIO to call the "guy of the four pesos." VINICIO said, "The problem with the four pesos guy -- I don't really know if that is better because I have not checked it -- The issue is that this guy is kind of complicated. He's very demanding." BLADI replied, "But don't stop for that reason, because that's a sure deal." VINICIO agreed and told BLADI, "Come over here." I believe BLADI asked to purchase more heroin from VINICIO because he was out of drugs ("I can't be this way."); that VINICIO's supplier offered to give him 400 grams of heroin ("I told him send me a sample, and he told me, 'No, I'm going to send you 400.'"); that VINICIO told BLADI to meet him at Target Location #5 to discuss purchasing heroin ("come over here and we will talk in person."); and that VINICIO told BLADI his heroin supplier was difficult to deal with ("He's very demanding.").

### 6. DIAZ – Supplies Cocaine to the VICTORIA DTO

84.     During this investigation, DIAZ has been intercepted negotiating the sale of multiple kilogram quantities of cocaine to VICTORIA.  In these calls, VICTORIA and BLADI both referred to DIAZ as "Alex." As detailed below, investigators have seen DIAZ and VICTORIA meet after intercepted calls, which indicated they were meeting to exchange drugs. DIAZ was first intercepted over VICTORIA's phone using (857) 707-5958, and then later using (781) 541-0328.  Investigators compared the voices from the intercepted calls over these two phones, and confirmed the user of both phones was the same person.  As detailed above, on November 30, 2016, investigators seized $80,990 from DIAZ after he left Target Location #3. DIAZ was identified during that car stop by his license.

**DIAZ left a sample of cocaine for VICTORIA.**

85.     On August 15, 2016, at approximately 9:28 p.m. (session #7638), DIAZ used (857) 707-5958 to call VICTORIA, and the call was intercepted over Target Telephone #1.  DIAZ told VICTORIA he would meet him outside a theater, and told VICTORIA to look for a "gold Cherokee and the plate ends with 011."  Approximately 15 minutes later, VICTORIA called DIAZ to tell him he had arrived.  DIAZ told VICTORIA, "Check the back door in the floor.  Open it and it will be there in the back driver's side."   VICTORIA said he had to wait because people were nearby.  DIAZ said to wait, and VICTORIA said he would call back if he needed anything. A few minutes later, VICTORIA called DIAZ.  VICTORIA said he had already left the area. DIAZ told VICTORIA that he had not "checked it well" but "they were all the same."  VICTORIA asked if he could meet DIAZ in a couple of days, and DIAZ agreed.  I believe DIAZ left samples of cocaine in his vehicle ("Cherokee"; plate ends in "011") for VICTORIA to pick up ("Check the back door in the floor.  Open it and it will be there in the back driver's side."); that DIAZ told

VICTORIA to check the samples well; and that VICTORIA planned to meet DIAZ in a couple of days to purchase more cocaine, if the samples tested well.

### DIAZ delivered five kilograms of cocaine to VICTORIA.

86.     On August 17, 2016, at approximately 12:10 p.m., DIAZ called VICTORIA and asked if he was "in the area."   VICTORIA said he was at his "ranch in Malden" and asked DIAZ, "Do you rather do it there?  It's more quiet."  DIAZ agreed, and VICTORIA said he would send DIAZ his number.   After ending the call, VICTORIA texted DIAZ the address to his then residence, "37 Skyline dr Malden."  After intercepting this call, surveillance officers went to the area near VICTORIA's residence (37 Skyline Drive, Malden).   At approximately 1:59 p.m., officers saw a Jeep Cherokee, bearing Rhode Island license plate 437 011, circling the neighborhood around Skyline Drive.   At 2:11 p.m., officers saw the Jeep park in front of 37 Skyline Drive.  At 2:29 p.m., the Jeep left the area.

87.     A few minutes later at approximately 2:35 p.m. (session #4103), VICTORIA called BLADI over Target Telephone #3.  BLADI told VICTORIA he was going to send GORDO and MENOR to Ramon's.  VICTORIA said he had met with "Alex," and BLADI asked if Alex had "lowered the price."  VICTORIA said Alex had left him "two hands" and told him to work at his "own pace."  VICTORIA and BLADI talked about whether they should "offer" it at "33" so they could earn "1,000 pesos."  BLADI said they he would rather "buy" from the person in "Rhode Island at 34" so he could earn more money.  BLADI said he prefers to take his time and earn "7,000 and not 1,000."  DEIBY agreed, and said if the "lower it, they can crumble it and . . . add to it" to make more money.  BLADI asked if it was "really good" and VICTORIA said it was "good," but it did not have "shine."  I believe that BLADI was going to have GORDO and MENOR bring drugs to ARIAS ("Ramon's"); that VICTORIA had just purchased ten kilograms

of cocaine ("two hands") from DIAZ ("Alex"); that VICTORIA and BLADI debated which supplier had the better quality cocaine which allowed them to increase their profits when they diluted and resold it; and that VICTORIA said that the cocaine he had was good quality but did not have a "shine."

88.     As detailed above, on November 30, 2016, investigators intercepted calls between VICTORIA and DIAZ, which indicated that DIAZ was going to collect a drug debt from VICTORIA.   DIAZ had been intercepted numerous times negotiating cocaine sales with VICTORIA, including on November 18, 2016, when DIAZ agreed to deliver five kilograms of cocaine to VICTORIA.  Investigators conducting surveillance of 34 Broad Street (Target Location #3) saw DIAZ park a car outside of 34 Broad Street and enter the building.  As detailed below, Target Location #3 is a drug storage location.  DIAZ came out of the building carrying a weighted box, which he placed inside his car.  Investigators followed DIAZ after he left 34 Broad Street, and a MSP trooper conducted a traffic stop as DIAZ approached Logan airport.  The Trooper recovered approximately $84,990 from DIAZ's car.  DIAZ claimed that some of the money was his, and that the rest belonged to someone else whom he did not name.  The money was wrapped in green, plastic wrap in approximately $10,0000 bundles.

## II.    JEFFERSON, SEPULVEDA, SANTANA, ALAMO, JULIAN, and WELLINGTON - Customers of the VICTORIA DTO.

89.     Among the numerous drug customers who investigators have identified, JEFFERSON, SEPULVEDA, SANTANA, ALAMO, JULIAN, and WELLINGTON have consistently purchased large quantities of heroin and cocaine from VICTORIA throughout the investigation.  The following calls are representative of the numerous calls that were intercepted

over VICTORIA's phones which demonstrate the quantities of heroin and cocaine that these customers have purchased from VICTORIA.

### i) JEFFERSON – Cocaine and Heroin purchaser.

90.    JEFFERSON was intercepted over VICTORIA's phone numerous times using (781) 513-0055 to order cocaine and heroin from VICTORIA.  During one intercepted call, JEFFERSON told VICTORIA he had to meet with his probation officer.  A review of the Essex County Superior Court Probation files for Jefferson RODRIGUEZ shows he has repeatedly entered (781) 513-0055 on his monthly probation form as being his telephone number.  Moreover, VICTORIA refers to JEFFERSON by his name ("Jefferson") in calls.  Finally, the phone number (781) 513-0055 is subscribed to in the name of Shirley Morales.  VICTORIA has been seen entering the building where JEFFERSON lives (Target Location #10) numerous times following intercepted calls indicating that VICTORIA was delivering drugs to JEFFERSON.  The apartment which JEFFERSON lives in, C-91, is also rented in Shirley Morales' name.

## JEFFERSON and VICTORIA discussed the dangers of drug dealing.

91.    On June 28, 2016 at approximately 4:13 p.m., (session #377), VICTORIA called JEFFERSON, and the call was intercepted over Target Telephone #2.  VICTORIA said, "I got a call at 9:00.  I got a call for three doves . . . I was on your side.  On the B side . . . So the day was slow, and I said, 'Let me not lose that sale, and I went to bring the doves, dude, and I went through that Lynnway."  JEFFERSON interrupted saying, "I had told you not to go that way.  Listen to me."   VICTORIA continued, "I was anxious to leave . . . then I passed the bridge from Lynn to the B, and when I was getting to the B, up near the lights . . . one of those fucking was behind me.  He was behind, and I continued, but I saw him, and he stopped me.  He put the light on me."  VICTORIA told JEFFERSON he was stopped because he "came down the bridge too fast."

VICTORIA continued, "One of them went to the back with the license and stuff, and a Puerto Rican came to ask me questions, and this or that." JEFFERSON replied, "No. Dude, listen. Don't get scared, because you don't have any of those . . . You never had . . . So never [get] scared if they come to the car. Why do I have to get out of the car?" VICTORIA replied, "No. I don't . . . get nervous. I don't." JEFFERSON told VICTORIA, "Never get scared if they come to the car. Why do I have to get out of the car? . . . You have to listen to me, because I'm telling you. Those people are dangerous. It's been about four years since those people don't bother me, but it's because I know how to defend myself. Do you understand me? . . . I had defended myself, because I go on YouTube and watch that stuff." VICTORIA agreed. JEFFERSON said, "I'm telling you that streets are toughs here." Later in the conversation, JEFFERSON told VICTORIA, "I'm going to tell you something. You are thinking very well. You decided to do it well when talking about the transparent one . . . The bottom is going to fail once that transparent shit comes." VICTORIA replied, "No, it is failing, dude, it's failing." JEFFERSON said, "It will be however it is, and they will complain. It may come straight from down there without having been touched, and they will complain." VICTORIA replied, "Most people we see, those are people that have old stuff." JEFFERSON said, "Yes and no. That stuff doesn't give troubles." I believe VICTORIA told JEFFERSON that after he delivered cocaine to a customer in Boston ("I got a call for three doves . . . I was on your side. On the B side . . . I went to bring the doves"), he was stopped by police for speeding ("came down the bridge too fast"; "One of them went to the back with the license and stuff"); that VICTORIA remained calm ("I don't get nervous"); that JEFFERSON said he had no reason to be nervous because he did not have drugs with him at the time ("Don't get scared, because you don't have any of those"); that JEFFERSON studied about how to respond to police questions during a traffic stop to avoid getting arrested ("It's been about four years since those

people don't bother me, but it's because I know how to defend myself . . . I go on YouTube and watch that stuff."); that JEFFERSON told VICTORIA that customers complained even when the drugs were high quality ("It may come straight from down there without having been touched, and they will complain."); but that their customers were not complaining about the quality of the drugs they were selling at that time ("Most people we see, those are people that have old stuff."; "That stuff doesn't give troubles.").

### JEFFERSON was intercepted ordering heroin and cocaine from VICTORIA.

92.     On November 8, 2016, at approximately 2:25 p.m. (session #1175), JEFFERSON called VICTORIA, and the call was intercepted over Target Telephone #12.  VICTORIA asked if JEFFERSON was going to be "ready for today."  JEFFERSON replied, "Um, no.  I am not ready but will have like 7,000."  VICTORIA said, "The thing is, I put my hand on the ten pesos. I took them for myself and did not give anything to the guy because I am under pressure, you know?"  JEFFERSON replied, "No, it's alright.  I will give you seven or eight.  Let me see how much I can pick up . . . so you come see me with a dove, because I owe one for that kid from that same day.  You remember?"  VICTORIA said he remembered and was going to "remind" JEFFERSON.  JEFFERSON told VICTORIA, "I will give it to him now, and send me one, but you have to come and see me before 6:00, you hear me?"  VICTORIA agreed.  JEFFERSON told VICTORIA he might have "7,000" for VICTORIA by 5:00 p.m., and asked VICTORIA to send "a dove" by that time.  VICTORIA agreed.  I believe JEFFERSON owed VICTORIA money for drugs he had purchased on consignment ("7,000"); that JEFFERSON asked VICTORIA to send him cocaine ("a dove") when VICTORIA went to pick up the money; and that VICTORIA told JEFFERSON he needed to collect the drug debt because he (VICTORIA) also owed a drug debt

("The thing is, I put my hand on the ten pesos.  I took them for myself and did not give anything to the guy because I am under pressure, you know?").

93.     Later that evening at approximately 8:31 p.m. (session #1106), JEFFERSON called VICTORIA.   JEFFERSON told VICTORIA, "The guy told me to text you, but I don't like texting."   VICTORIA replied, "But now we will need to do it like that buddy.  That's what the doctor told me."  JEFFERSON asked, "Who?  The man?"  VICTORIA replied, "Yes, my man the representative, you know?"   JEFFERSON asked, "What did he tell you?  Just to text?  VICTORIA replied, "No.  Not to do things, you know.  Not to talk."  JEFFERSON acknowledged but continued, saying "What I was going to tell you is that tomorrow I will pay off the guy . . . and I will send you the other thing."   VICTORIA told JEFFERSON to "relax" and take his time. I believe VICTORIA's attorney told him not to conduct his drug business over the phone because investigators might be intercepting his phone after the October 6, 2016 heroin seizure ("But now we will need to do it like that buddy.  That's what the doctor told me."; "Not to do things, you know.  Not to talk."); and that JEFFERSON planned to send VICTORIA money to satisfy his outstanding drug debt ("tomorrow I will pay off the guy . . . and I will send you the other thing.").

### i)  *SEPULVEDA – Cocaine and Heroin Purchaser*

94.     SEPULVEDA has been intercepted numerous times using (781) 588-4226 to order cocaine from VICTORIA.  At times, SEPULVEDA has also supplied drugs to VICTORIA.  On December 7, 2016, the location information from SEPULVEDA's phone indicated that the phone had traveled to Pennsylvania and then returned to Massachusetts.  Law enforcement officers went to a location in Lynn where the phone data indicated the phone was located.  The phone location data indicated the phone was inside a van.  Agents directed MSP troopers to conduct a traffic stop on the van, and identified the passenger as Jesus SEPULVEDA by a Pennsylvania driver's license.

SEPULVEDA stated that he had been in Pennsylvania.   On December 8, 2016, a pole camera situated outside of 111 Eliot Road (Target Location 9) captured SEPULVEDA enter Target Location 9.  VICTORIA has been seen at this location a number of times after calls indicated that he was going to this location to deliver drugs that SEPULVEDA had purchased.

### SEPULVEDA was intercepted discussing his drug debt with and ordering drugs from VICTORIA.

95.     On November 6, 2016, at approximately 2:18 p.m. (session #919), SEPULVEDA (781) 588-4226 and VICTORIA exchanged a series of text messages about SEPULVEDA' outstanding drug debt.  SEPULVEDA wrote, "I will owe you 20,400 plus 335 . . .  20,735 this week from Thursday on.  I will let you know . . . To liquidate that and start another one." VICTORIA agreed.  I believe SEPULVEDA told VICTORIA he planned to pay VICTORIA $20,735 to satisfy the outstanding drug debt that he owed to VICTORIA so that he could purchase more drugs ("to liquidate that and start another one.").

96.     On November 15, 2016, at approximately 4:47 p.m., VICTORIA and SEPULVEDA exchanged a series of text messages.   The messages were intercepted over VICTORIA's phone (Target Telephone #12).

| | |
|---|---|
| VICTORIA: | Talk to me man. |
| SEPULVEDA: | Let's do it now. |
| VICTORIA: | Alright what do you need. |
| SEPULVEDA: | 1 . . . I just got close to the money today. You know how people are bro. |
| VICTORIA: | Get on the ball.  In how long? |
| SEPULVEDA: | I actually need 1 and a half but there are 2 cocksuckers that I'm going to get rid of because they don't pay who think that what's not theirs is theirs. There's nothing for anyone until it's taken care of. |

VICTORIA:          Don't be late with this one bro. Get on it.

97.     Based on the investigation to date, I believe SEPULVEDA ordered either heroin or cocaine ("I actually need 1 and a half"); that SEPULVEDA told VICTORIA he was collecting money from his customers to repay VICTORIA what he owed ("I just got close to the money today."); and that VICTORIA told SEPULVEDA not to be late paying for the drugs he was buying ("Don't be late with this one.").

### i)  *SANTANA – Cocaine and Heroin Purchaser*

98.     In September 2016, I was notified by the MSP and a Boston Police Department officer that SANTANA had been arrested and charged with possessing a fraudulent identification. The Officer notified DEA agents that SANTANA had information relating to this investigation. The officer provided the DEA with SANTANA's phone number, which is the same number that SANTANA was intercepted using to purchase drugs from VICTORIA.   SANTANA was surveilled from a court appearance to 42 Oldsfield Road in Dorchester, which is his residence. During this investigation, VICTORIA has been seen at that location after intercepted calls indicated that he was delivering drugs to SANTANA at that location.

### SANTANA called to complain about the quality of drugs he purchased from VICTORIA.

99.     On July 14, 2016, at approximately 12:45 p.m., SANTANA called VICTORIA, and the call was intercepted over Target Telephone #1.  SANTANA told VICTORIA, "The guy got a lot of complaints.  He told me that doesn't look like the stuff from the last time . . . Those two things that you brought me."  VICTORIA replied, "How come?  Because I haven't had too many complaints.  Maybe a few, but that depends on the work."  SANTANA replied, "He called me and told me that last night that was getting a lot of complaints, and he's selling that very little by

little." I believe SANTANA told VICTORIA that the drugs he had purchased were not high quality ("The guy got a lot of complaints. He told me that doesn't look like the stuff from the last time . . . Those two things that you brought me.") and that VICTORIA said he had not received many complaints ("Because I haven't had too many complaints.").

**SANTANA and VICTORIA discussed their drug inventories.**

100.    On September 20, 2016, at approximately 4:35 p.m., SANTANA called VICTORIA, and the call was intercepted over Target Telephone #1. SANTANA told VICTORIA, "Buddy, I have two and a half there that the guy brought me. The white from 'arriba.'" VICTORIA confirmed, "From arriba?" SANTANA asked which "white" he was talking about, and VICTORIA replied, "The white from 'abajo.'" SANTANA laughed and said, "Yes." VICTORIA said, "They gave us a bunch of that stuff on Sunday. The crazy one . . . They gave me two. They are really good. Killer." SANTANA asked, "What did you do with the other?" I believe that SANTANA told VICTORIA he had two and a half kilograms of cocaine ("two and a half there that the guy brought me. The white from 'arriba.'"); VICTORIA asked if SANTANA had Fentanyl ("The white from abajo"); VICTORIA told SANTANA that he had two kilograms of high quality Fentanyl ("They gave me two. They are really good. Killer."); and SANTANA asked if VICTORIA had sold other drugs ("What did you do with the other").

   *i) ALAMO – Cocaine Purchaser*

101.    ALAMO was intercepted numerous times using (978) 223-0188 to order cocaine from VICTORIA. Likewise, a pole camera in the vicinity of ALAMO's residence (Target Location #6) has captured VICTORIA numerous times at that location after investigators intercepted calls indicating that VICTORIA was delivering cocaine to ALAMO at this residence.

I reviewed the driver's license photograph of ALAMO, and confirmed he is the same person who has been seen at Target Location #6 meeting with VICTORIA.

**ALAMO asked to purchase a kilogram of cocaine from VICTORIA.**

102.   On November 4, 2016, ALAMO called VICTORIA, and the call was intercepted over Target Telephone #12.  ALAMO asked, "What about the women?"  VICTORIA replied, "I have not found anything."  ALAMO replied, "My friend called me the other day, and he was with two girls, but they were 32 years old, and I told him, 'No way.'"  VICTORIA told ALAMO, "It's going to get uncomfortable."  ALAMO replied, "Well, you let me know if anything, and I will let you know if anything too."  I believe that ALAMO asked VICTORIA if he had kilograms of cocaine to sell ("what about the women"); VICTORIA told ALAMO he did not have any; ALAMO told VICTORIA he had been offered kilograms of cocaine for $32,000 apiece ("My friend called me the other day, and he was with two girls, but they were 32 years old") but that ALAMO turned it down because it was too expensive ("I told him, 'No way.'"); and ALAMO and VICTORIA agreed to call each other if they located cocaine for a better price ("Well, you let me know if anything, and I will let you know if anything too.").

**ALAMO was intercepted discussing a drug shipment with VICTORIA.**

103.   On November 9, 2016, at approximately 1:38 p.m. (session #1035), ALAMO called VICTORIA, and the call was intercepted over Target Telephone #12.  ALAMO asked if the "women" had arrived.  VICTORIA replied, "I believe they arrive today, yeah.  On the Santo Domingo flight that always arrives.  On the Jet Blue one.  The direct one."  VICTORIA told ALAMO he would let him know.  Later that night at approximately 8:53 p.m. (session #1219), ALAMO called VICTORIA again, and the call was intercepted over Target Telephone #12. ALAMO asked, "And the women, did they already arrive?"  VICTORIA replied, "They haven't

let me know.  The guy told me he was going to call me, and I just called him and he told me he was working on that."  ALAMO told VICTORIA, "A friend of mine also told me that they have some little women over there in the apple, and he called me to see how I was doing and see if he would bring them down to me.  The B one . . . He told me that he was going to call me to see if he would bring them down to me here."  VICTORIA asked, "And from where?  From what exit?"  ALAMO replied, "He will come close from there."  VICTORIA replied, "Let me see if I get on that."  I believe VICTORIA and ALAMO were expecting a load of heroin ("women") that was being smuggled aboard a JetBlue flight from Santo Domingo to New York ("I believe they arrive today, yeah.  On the Santo Domingo flight that always arrives.  On the Jet Blue one.  The direct one."); that ALAMO told VICTORIA he had a supplier in New York ("in the apple") who had either cocaine or heroin for sale ("A friend of mine also told me that they have some little women over there") and that the supplier would transport it to Boston ("the B").

104.    On November 11, 2016, at approximately 9:59 a.m., ALAMO called VICTORIA, and the call was intercepted over Target Telephone #12.  ALAMO said, "Damn those women are so beautiful! . . . I took 500 pesos to pay my friend's rent over there . . . and it's like yours."  VICTORIA replied, "Well, I took something."   ALAMO replied, "It's so beautiful inside."  VICTORIA told ALAMO, "This kid came to get something this morning, but he left right away.  It was only two small things."  ALAMO said, "See to it so I can get you something with the one . . . He told me that he is fine there.  That he has a few of those girls."  VICTORIA said, "Let me see what's over at the ranch so I can tell you."  I believe that ALAMO told VICTORIA that he had seen the kilograms of cocaine that had arrived ("Damn those women are so beautiful! . . . I took 500 pesos to pay my friend's rent over there . . . and it's like yours."); VICTORIA had a supplier who had smaller quantities to sell ("This kid came to get something this morning, but he

left right away.  It was only two small things."); ALAMO offered to sell VICTORIA cocaine for $31,000 per kilogram ("See to it so I can get you something with the one . . . That he has a few of those girls."); and VICTORIA said he would check his inventory to figure out how much he wanted to purchase ("Let me see what's over at the ranch so I can tell you.").

### i) JULIAN – Heroin and Cocaine Purchaser

105.    During the course of this investigation, JULIAN was intercepted numerous times using (857) 237-1659 to order heroin and cocaine from VICTORIA.  At times, he was intercepted on a near daily basis ordering multiple ounces of cocaine.  On August 17, 2016, JULIAN wired money to a male in Mexico and listed (857) 237-1659 as his phone number and provided a driver's license in the name of Gilberto Torres.  The phone is subscribed to in the name of Junior Torres. Location data information for this phone shows it is currently located at 520 Essex Street in Bangor Maine.  This address is listed to Gilberto Torres in CLEAR, which is a public records database.

106.    On July 6, 2016, JULIAN called VICTORIA, and the call was intercepted over Target Telephone #1.  VICTORIA asked, "Do you mind if I send you the guy that I am training?" JULIAN replied, "You are the one who has to bring him over and show him to me."  VICTORIA said he was not around.   JULIAN replied, "Send him over then."   VICTORIA said, "He is trustworthy . . . Listen, should I send you the two together or divided?  How should I send them?" JULIAN told VICTORIA, "Bring me four of the best you got . . . I need the best."

107.    Surveillance footage from the pole camera in the vicinity of 24 Aberdeen Road (Target Location #11) in Milton, which is JULIAN's residence, showed MENOR arriving at 24 Aberdeen Road at approximately 1:41 p.m. and entering Target Location #11.  As detailed above,

JULIAN was intercepted ordering drugs from VICTORIA during the course of this investigation. I believe MENOR brought drugs that JULIAN had ordered from VICTORIA.

108.    I believe that VICTORIA asked if he could send MENOR to deliver the cocaine that JULIAN ordered ("Do you mind if I send you the guy that I am training?"); JULIAN agreed to allow MENOR to deliver the drugs after VICTORIA assured him that MENOR was "trustworthy"; and JULIAN asked VICTORIA to send him four ounces of cocaine ("Bring me four of the best you got . . . I need the best.").

**JULIAN complained about his drug business to VICTORIA.**

109.    On September 13, 2016 at approximately 12:03 p.m., VICTORIA called JULIAN, and the call was intercepted over Target Telephone #1.   JULIAN told VICTORIA he was "struggling up here."   VICTORIA replied, "You told me you were coming this weekend, dude." JULIAN replied, "I have not seen this guy since Sunday, dude! . . . I'm here taking care of the few people by myself because he can't do it.  He passes me some calls."   VICTORIA said, "He can't do that to you."   JULIAN replied, "He's passing me a few calls for small things.  I'm trying to rebuild the business again."   VICTORIA said, "But he has to give you the phones."   JULIAN answered, "No, because he doesn't have to send me everybody . . . little things . . . selling little grams and a half gram.  Little things like that.  But today the good guy is coming.  He called me yesterday, that's why I have not left."   VICTORIA told JULIAN, "You are behind, and also you are doing nothing on this side."   VICTORIA reminded JULIAN that he owed "5,000 pesos." JULIAN said he was "rebuilding his business" and would ask his cousin for help.   I believe VICTORIA called JULIAN to collect a drug debt ("You are behind"; JULIAN owed "5,000 pesos"); that JULIAN complained that his supplier had stopped selling to him and that JULIAN lost his customers ("I have not seen this guy since Sunday, dude!"; "struggling"; "selling little

grams and a half gram"); that VICTORIA asked if JULIAN's supplier left him the phones to contact his customers ("He has to give you the phones"); and that JULIAN said he was trying to rebuild his drug business by working with someone else ("But today the good guy is coming. He called me yesterday, that's why I have not left.").

**JULIAN was intercepted ordering drugs from and discussing a drug debt with VICTORIA.**

110.   On November 4, 2016, at approximately 6:25 p.m. (session #812), VICTORIA sent a text message to JULIAN that read, "You want 250?" JULIAN replied, "Yes." VICTORIA replied that he would be there at 8:00 p.m. Later that evening at approximately 8:01 p.m., VICTORIA sent JULIAN a text message that read, "He's on his way almost arriving." At 8:18 p.m., VICTORIA called JULIAN and said, "He's going to walk to the door. You heard?" At approximately 8:27 p.m., JULIAN texted VICTORIA, "I sent you 4460." I believe that JULIAN ordered 250 grams of either heroin or cocaine from VICTORIA ("You want 250?"; "Yes"); VICTORIA sent a courier to deliver the drugs to JULIAN; and JULIAN gave the courier $4,460 to pay VICTORIA for the drugs ("I sent you 4460").

### i) WELLINGTON – Purchases heroin from VICTORIA

111.   WELLINGTON has been intercepted numerous times negotiating drugs sales with VICTORIA. VICTORIA has supplied heroin to WELLINGTON, and WELLINGTON has also supplied cocaine to VICTORIA. In November 2016, investigators obtained a warrant to obtain the data location information for WELLINGTON's phone. Officers went to the apartment where the data location indicated the phone was located, and knocked on the door claiming to be looking for a fugitive. A male inside the apartment produced a cedula from the Dominican Republic (which is a Dominican Identification card), which bore the name of Kelvin Alexander Soto Aguasviva. While still in the apartment, a female referred to the male as Wellington.

Investigators contacted officials in the Dominican Republic, who confirmed that Kelvin Aguasviva had a brother named Wellington Osnel Soto Aguasviva, and the officials provided a cedula containing a photograph of Wellington Aguasviva.  The photo attached to Wellington Aguasviva's cedula was shown to the officers who interviewed him. They confirmed it was the same male who they interviewed.  Accordingly, I believe WELLINGTON is using his brother's identification.  A facial recognition search confirmed that WELLINGTON has an outstanding drug warrant in Massachusetts state court in the name of Franky Rodriguez.

112.    In intercepted calls, VICTORIA addresses WELLINGTON as WELLINGTON. Based on the intercepted calls, I believe WELLINGTON has a brother who is currently identified only by the name "Pelon" who lives at Target Location #12.  A pole camera situated outside Target Location #12 has captured VICTORIA, JANLE, and NENE at that location after intercepted calls indicated that they were delivering drugs to Pelon at that address.

113.    On November 8, 2016, VICTORIA used Target Telephone #12 to exchange text messages with WELLINGTON.

| | |
|---|---|
| WELLINGTON: | I am waiting for the bro.  He told me he was going to resolve the little thing between Tuesday or Wednesday so I can give you that man. |
| VICTORIA: | Go ahead then because I am in a rush man . . . Tell Pelon as well. |
| WELLINGTON: | Yeah he told me yesterday that he had to give you some tickets |
| VICTORIA: | Do you have of the one from arriba |
| WELLINGTON: | Yesterday . . . a friend of mine hit me about one that he had left but he gave it to me with the 2 and I did it with the 2.5 because I had none left . . . It's going up it seems like . . . A friend called me offering me 1 and a half if you are interested let me know because my friend wants to give me 3. |
| VICTORIA: | With the 1 I could take it. |

114.    I believe that WELLINGTON told VICTORIA he was waiting to hear from his brother, Pelon, who owed VICTORIA money ("He had to give you some tickets"); VICTORIA asked if WELLINGTON had cocaine for sale ("Do you have of the one from arriba?"); WELLINGTON purchased a kilogram of cocaine for $32,000 and sold it for $32,500 ("He gave it to me with the 2 and I did it with the 2.5 because I had none left."); WELLINGTON had another supplier who offered to sell him three kilograms of cocaine for $31,000 apiece ("A friend called me offering me 1 and a half if you are interested let me know because my friend wants to give me 3."); and VICTORIA agreed to purchase the kilograms for $31,000 a piece ("With the 1 I could take it.").

### WELLINGTON offered to sell VICTORIA heroin.

115.    On November 17, 2016, VICTORIA used Target Telephone #12 to exchange text messages with WELLINGTON.  The messages were intercepted over Target Telephone #12.

| | |
|---|---|
| WELLINGTON: | Sonny, I was talking to the one that wants to give me work to give it to you . . . to give you something of the abajo to get out of that problem . . . If you want we will go there you and me for you to see what's up and to pass along something of that to you |
| VICTORIA: | No I'm not really fucking with that. |
| WELLINGTON: | Buddy, of the down one, brown also.  I was telling you it wasn't of the china one. |

116.    I believe WELLINGTON offered to give VICTORIA heroin ("work"; "abajo"' "the down one, brown") to pay off a drug debt that WELLINGTON owed to VICTORIA ("to get out of that problem"); that VICTORIA thought WELLINGTON wanted to give him Fentanyl ("I'm not really fucking with that"); and that WELLINGTON clarified it was heroin and not Fentanyl ("the china one.").

### III.    *RUBIO, MENOR, GORDO, NENE, JANLE and FELIX – Deliver Drugs and Money as part of the VICTORIA DTO*

117.    As detailed above, investigators have identified a number of individuals who are employed by VICTORIA and BLADI who assist in delivering drugs to customers, collecting drug debts from customers, and testing the quality of heroin they have purchased.   In addition to assisting with the distribution of drugs, RUBIO has been intercepted numerous times ordering heroin from BLADI, which RUBIO then redistributed to his own customers.   GORDO and RUBIO operate the VICTORIA DTO's drug stash locations, which are Target Locations #3 and #8, where drugs are stored and packaged for sale.   MENOR worked as a drug courier for VICTORIA until the end of the summer 2016.   NENE and FELIX routinely drive BLADI around to pick up drugs from suppliers and deliver drugs to customers.   JANLE is believed to be VICTORIA's relative, who moved to Massachusetts from the Dominican Republic to assist VICTORIA in distributing drugs.   JANLE is believed to reside at Target Location #3, based on physical surveillance and the fact that the data location from his phone indicates it is at this location in the nighttime.   He has been intercepted discussing the quality of heroin that VICTORIA has tested prior to selling it to his customers.    The calls detailed below, are representative of calls which describe the roles of MENOR, RUBIO, GORDO, JANLE, and FELIX in the VICTORIA DTO.

118.    As set forth earlier in this affidavit, many of the targets are related to by blood, marriage, or social relation.  Starting with BLADI, who was identified in a separate and ongoing drug investigation, investigators worked to identify the other Target Subjects.   Based on observations made by physical and electronic surveillance, we identified several of the Target Subjects.  For example, GORDO was identified by his driver's license, which is in his true name (Friman Gonzalez).  GORDO is BLADI's brother.  RUBIO was identified after he was rushed to the emergency room on November 2, 2016.  RUBIO was taken from Target Location #8 after he

apparently overdosed on that date.  FELIX was identified through his driver's license, which is in his true name (Felix Salas DIAZ).  NENE was identified on December 7, 2016, during a car stop, which was directed by DEA agents.  NENE produced a driver's license bearing the name Amable Diaz.  JANLE was the passenger in the car at the time of the stop.  JANLE produced a border crossing card, indicating that he had entered the United States through Mexico.  The name on the card was Hamlet Mendez Nova, which is also the name that JANLE's phone is subscribed to. Moreover, data location information for JANLE's phone indicated it was in the car at the time of the stop, and BLADI was later intercepted discussing the fact that NENE and JANLE were stopped.  MENOR was identified as Wilfredo SANTANA after he was arrested on September 26, 2016, by the Weymouth Police Department and charged with distribution of a Class B drug and conspiracy to violate the controlled substance Act.  After his arrest, MENOR was intercepted calling VICTORIA and telling him about the arrest.  GORDO was also intercepted telling BLADI that MENOR had called him (GORDO) asking GORDO to post his bail.

### July 6, 2016:  VICTORIA and RUBIO discussed selling a half kilogram of drugs to a customer.

119.    On July 6, 2016, at approximately 3:56 p.m. (session #4357), RUBIO called VICTORIA, and the call was intercepted over Target Telephone #1.  RUBIO asked, "Are you around here?"  VICTORIA said he was in Lynn.  RUBIO said, "There's a guy who wanted a half."  VICTORIA asked, "So then what?  It's that you are too backed up, man.  You are not giving me any money."  RUBIO replied, "I am going to.  I am working with your stuff already. It's that I was kind of out of the game."  VICTORIA asked, "So then when are you going to give me that half for the half that I am going to give you?"  RUBIO replied, "I will give it to you in a couple days.  Two to three days."  VICTORIA told RUBIO, "Let me send Menor to see you." Immediately after ending the call, VICTORIA called (857) 249-8920 and spoke to MENOR.

VICTORIA told MENOR, "Bring half to Rubio."  I believe RUBIO asked VICTORIA to sell him

a half kilogram of either cocaine or heroin ("There's a guy who wanted a half."); that VICTORIA

complained that RUBIO was not working hard to sell drugs ("You are not giving me any

money."); that RUBIO told VICTORIA he would try harder to sell more drugs for VICTORIA

("I am working with your stuff already. It's that I was kind of out of the game."); that RUBIO

told VICTORIA he would pay him for the drugs in "two or three days"; and that VICTORIA

agreed to sell RUBIO the drugs on consignment, and told MENOR to bring the drugs to RUBIO

("Bring half to Rubio.").

120.    On August 17, 2016 at approximately 7:31 p.m. (session #33), RUBIO called

Target Telephone #5 and spoke to BLADI.  RUBIO is a drug customer who has been intercepted

on numerous occasions ordering drugs from BLADI.  RUBIO told BLADI, "I need 20."  BLADI

asked, "Are you at the house?"  RUBIO replied, "No. I'm not there.  I'm calling you so you have

that ready for me."  BLADI agreed and RUBIO asked if "the guys" were close.  BLADI said he

did not know, and RUBIO replied, "Well call them and let me know if that is ready and available

so I can move because these people are waiting for it."  BLADI replied, "No. That is there.  Let

me call Menor or Gordo.  RUBIO said, "Call the guys so they get one out I'll go pick that up

then."   I believe RUBIO wanted a finger of heroin ("20"); that BLADI said he would have

MENOR or GORDO prepare it for RUBIO; and that RUBIO wanted to pick it up quickly because

he had customers waiting to buy the heroin from him ("these people are waiting for it.").

121.    Immediately after ending the call with RUBIO, BLADI used Target Telephone #5

to call GORDO (session #34).   BLADI told GORDO, "Give 10 to Rubio, please . . . He is going

to go get it real quick.  Bring it to the barbershop.  Call him."  GORDO replied, "He can come

pick it up here."

**RUBIO ordered heroin from BLADI for a customer.**

122.    On November 1, 2016, a 911 call was placed from Target Location #8, requesting an ambulance.  Upon arrival, medics entered Target Location #8 and found RUBIO, who was unresponsive.  RUBIO was taken to the hospital.  On November 4, 2016 at approximately 3:50 p.m. (session #1347), BLADI called RUBIO.  RUBIO told BLADI he was just discharged from the hospital, and that nothing had happened.  RUBIO claimed he had fainted after becoming dizzy. BLADI told RUBIO that the landlord at Target Location #8 had called the police because "they" were being loud.  RUBIO said, "It wasn't the police but the fire department and the ambulance." BLADI told RUBIO that the superintendent of the building was watching RUBIO to make sure nothing illegal was going on in Target Location #8.  RUBIO said, "Look, I need three."  BLADI replied, "I don't have anything right now.  What I have left are two."  RUBIO replied, "Bring them to take them to the guy."  BLADI agreed.

**VICTORIA and MENOR discussed what to charge a customer for cocaine.**

123.    On July 28, 2016 at approximately 1:27 p.m. (session #6377), MENOR called VICTORIA.  The call was intercepted over Target Telephone #1.   MENOR asked, "Do you have some work around this area? They asked me for a half." VICTORIA replied, "The one you grabbed yesterday. Who wants it?"  MENOR replied, "The people who I gave the sample. They want to cook it."  VICTORIA asked, "How much are you selling it to him?"  MENOR replied, "I don't know.  How much should I do it for? I told him 1250 for an ounce."  VICTORIA told MENOR it was "six and a half for a half . . . money up front."  I believe a customer asked to purchase a half ounce of cocaine ("they asked me for a half"); that the customer planned to convert

the cocaine into crack cocaine ("They want to cook it."); and that VICTORIA told MENOR to charge the customer $650 per half ounce ("six and a half for a half . . . money up front.").

### BLADI directed MENOR and GORDO to deliver drugs to JULIAN at Target Location #11.

124.    On July 6, 2016, at approximately 9:20 a.m. (session #234), BLADI called MENOR, and the call was intercepted over Target Telephone #3.  BLADI said, "The crazy one is waiting for you at the house with some marijuana.  Bring him the three doves."  MENOR replied, "Let me get up.  Alright."  BLADI told MENOR to do it quickly.  A few minutes later at approximately 9:26 a.m. (session #235), MENOR called BLADI back and asked if he had to "weigh it."  BLADI said, "No. Weigh it.  There are three [that] are 93."  MENOR replied, "Let me weigh it, and I'll tell you right away.  The bag says it is 3.3, and this one says it is 101.3."  BLADI replied, "Get the other out and bring him only 93."  Based on the investigation to date and prior intercepted calls, I believe BLADI directed MENOR to deliver approximately three thirty-gram bags of cocaine ("three doves"; "Get the other out and bring him only 93") to a drug customer ("The crazy one is waiting for you at the house.").

125.    In a subsequent call that same day at approximately 10:36 a.m. (session #250), BLADI called GORDO, and the call was intercepted over Target Telephone #3.  BLADI told GORDO, "You have to go now to Primo's in Salem."  GORDO asked for the address, and BLADI told him it was "10 Proctor."  After intercepting these calls, investigators went to the area of 10 Proctor Street in Salem, and observed GORDO's Jeep parked in front of 8 Proctor Street at approximately 11:40 a.m.

126.    At approximately 12:00 p.m., investigators saw BLADI and VICTORIA sitting on the front steps of 34 Broad Street (Target Location #3).  They were joined by GORDO and MENOR at approximately 12:05 p.m. MENOR and GORDO were both carrying bags when they

entered the building at 34 Broad Street (Target Location #3).  At approximately 12:42 p.m., investigators saw MENOR and GORDO leave the building empty handed and leave the area.  I believe the bags that GORDO and MENOR brought into 34 Broad Street contained contraband: either drugs or drug proceeds.

127.    Surveillance footage from the pole camera in the vicinity of 24 Aberdeen Road (Target Location #11) in Milton, which is JULIAN's residence, showed MENOR arriving at 24 Aberdeen Road at approximately 1:41 p.m. and entering Target Location #11.  As detailed above, JULIAN was intercepted ordering drugs from VICTORIA during the course of this investigation. I believe MENOR brought drugs that JULIAN had ordered from VICTORIA.

128.    On November 4, 2016, at approximately 1:04 p.m. (session #1331), GORDO sent BLADI a text message that read, "Let me send you a picture."  BLADI replied by text, "Send it to my other number."  I believe GORDO wanted to send BLADI a picture related to drugs and BLADI told him to send it to his "other number."

**JANLE discussed drug quality with BLADI.**

129.    On October 3, 2016, at approximately 6:50 p.m., JANLE used (201) 981-0280, to call BLADI, and the call was intercepted over Target Telephone #13.  JANLE told BLADI, "The stuff that Bibi swung by last night is a killer.  Both of them . . .  The black one even better.  Both of them are a killer."  BLADI replied, "Ah, well then let's return mine then."  After taking another call from a different phone, BLADI told JANLE, "Take the stuff and go to the bodeguita.  It's a chubby dude."  JANLE said he was still with Bibi.  BLADI said, "Give me your number so I can give it to him."  JANLE replied, "Oh, but you have it.  201-981-0280.  Listen, you know what we are going to do with this?  That phone number, I am going to take your phone, the other one. So that you can have both, but it's so that when you call me, you call me at the other one alright?"

BLADI agreed and said the "dude" was going to call JANLE to meet at the bodeguita.  JANLE

agreed.  I believe JANLE tested some heroin that BLADI had purchased; that JANLE reported

the heroin was potent (""The stuff that Bibi swung by last night is a killer.  Both of them . . .  The

black one even better.  Both of them are a killer."); that BLADI asked JANLE to take drugs to a

customer ("take the stuff . . . to the chubby dude") at a local store ("go to the bodeguita"); that

JANLE gave BLADI his phone number so that BLADI could give it to the customer ("Give me

your number so I can give it to him."); and that JANLE talked about BLADI having more than

one phone ("That phone number, I am going to take your phone, the other one.  So that you can

have both, but it's so that when you call me, you call me at the other one alright?").

130.    On December 2, 2016, at approximately 11:23 a.m., BLADI called JANLE and

said, "There are three people over at GORDO's.  A woman and two guys."  JANLE told BLADI

not to "joke."  BLADI said, "On the second floor, there's a woman named Arelys that deals stuff

and sells cortina.  And, on the first floor where he goes, the dude also sells . . . Damn dude!  This

is rotten everywhere!"  JANLE agreed.  I believe BLADI told JANLE to be careful when he went

to GORDO's apartment because a woman who lives in the same building also sells drugs and

cutting materials ("cortina").

### FELIX and BLADI discussed the quality of heroin that was tested.

131.    FELIX has been intercepted over Target Telephone #3 using this phone to discuss

purchasing drugs and the quality of drugs with BLADI.  For example, on September 26, 2016, at

approximately 1:31 p.m. (session #7143), BLADI called FELIX.  The call was intercepted over

Target Telephone #3.  BLADI asked, "What did he tell you?"  FELIX replied, "He says that is

killer stuff."  FELIX told BLADI, "Check it thoroughly.  He told me that just by sight."  BLADI

replied, "No, no, no!  That's not like that Felix."  FELIX said, "No.  I told him to call me when

he checked it thoroughly, but he tells me that, that he bets 1,000 . . . killer stuff." FELIX told

BLADI he would let him know.   I believe BLADI gave FELIX a sample of heroin to test and that

FELIX replied that his tester thought the heroin was potent ("He says that is killer stuff."; "just

by sight"); that BLADI told FELIX to have the person check it "thoroughly"; and FELIX said he

would call after it was tested, but the tester said the heroin looked strong ("he bets . . . killer

stuff").

132.    On November 4, 2016, at approximately 1:34 p.m. (session #1340), BLADI called

FELIX.  BLADI said he called FELIX so they could "get together" BLADI's house.   BLADI

asked if FELIX could bring him "two new SIM cards."  FELIX agreed and said he would "take it

to" BLADI.  I believe BLADI asked FELIX to pick up two new SIM cards for his cellular phones;

that BLADI was changing his numbers again to avoid law enforcement detection; and that FELX

agreed to bring the SIM cards to BLADI's house, which is Target Location #2.

## Target Locations

### A.    *Drug Traffickers' Use of Residences Generally*

133.    Based upon my training, experience, participation in other narcotics investigations,

and extensive discussions with other law enforcement officers experienced in narcotics

investigations, I am aware that it is generally a common practice for drug traffickers to store drug-

related paraphernalia and records in their residences for longer periods of time than they keep

drugs in their residences.  I have participated in the execution of numerous search warrants of the

residences of drug traffickers whose criminal activity is similar to that of the Defendants.  In a

substantial number of residential searches executed in connection with the drug investigations in

which I have been involved, drug related evidence has typically been recovered including cash,

records, drugs, and other valuable items.  Based on this experience and my training, I believe that:

a)      Drug traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system. Accordingly, narcotics traffickers frequently maintain large amounts of cash and other valuable assets at their residence in order to maintain and finance their ongoing business;

b)      Drug traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, emails, and other documents relating to the transportation, ordering, sale and distribution of controlled substances and monetary instruments and other assets, and to debts and collections relating to monies owed or due for the distribution of controlled substances; and documents relating to the transportation of controlled substances, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts. Such documents may be maintained in paper or electronic form, and are generally maintained where the narcotics traffickers have ready access to them, including in cell phones and other electronic media capable of storing such information electronically, at locations such as their residences or other locations where they regularly conduct their drug business. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.

I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises;

c)      It is common for drug dealers to secrete records of drug transactions in secure locations within their cell phones, computers, residences, businesses, and/or other locations and devices over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities;

d)      It is common for significant drug traffickers to hide controlled substances, proceeds of drug sales (i.e., large amounts of currency, financial instruments, jewelry, safety deposit keys and deeds to real property), and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, documents indicating travel in interstate and foreign commerce, and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences, businesses, or other locations over which they maintain dominion and control, for ready access and to conceal them from law enforcement authorities;

e)      Drug traffickers commonly maintain electronic and paper books or documents which reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization, and other contact or identification data relating to the distribution of controlled substances.  Such records and items are maintained where the traffickers have ready access to them, commonly on the traffickers' cell phone(s).  They also tend to

maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing;

f) Drug traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences, and frequently maintain these photographs on their cell phone(s) and other electronic devices;

g) Drug traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, safe-deposit boxes and other containers, which are further secured by combination and/or key locks of various kinds in order to hide the contraband from other individuals living at or in the vicinity of their residence;

h) Drug traffickers frequently build "stash" places within their residences or other locations in order to store illicit drugs as well as the items described above;

i) Residents, whether drug traffickers or not, typically keep items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

134. In my training and experience, I know that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Indeed, throughout this

investigation, the Target Subjects have cycled through multiple telephones. Based on my training and experience, drug traffickers often use multiple phones and change their phone numbers frequently to avoid law enforcement detection. For example, VICTORIA and BLADI changed their phones after investigators seized heroin from VICTORIA on October 6, 2016. Investigators have intercepted five different phones used by VICTORIA and four different phones used by BLADI. Investigators are currently intercepting two phones used by BLADI. Investigators have intercepted two phones used by ISIDRO and three phones used by TORRES. On October 12, 2016, an electronic surveillance camera captured VINICIO exiting Pacific Auto carrying four different cellular phones. Likewise, investigators saw ARIAS outside of residence with multiple phones. A cellular telephone is a handheld wireless device used for voice and text communication as well as for accessing the internet. Telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls and text messages made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training, experience, and research, I know that many cellular telephones have capabilities described above. In my training and experience, examining data stored on devices of this type

can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

135. Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth hereinafter, I believe the Target Subjects, like many drug traffickers, use their residences in furtherance of their ongoing drug-trafficking activities, and that, among other things, documentary and other evidence regarding those activities, including, but not limited to, the items set forth in Attachments B, will be found in the Target Locations. *See e.g.*, *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[3]

**B.** ***Description and Criminal Activity at Target Locations***

**(1) VICTORIA's Residence – Target Location #1**

Description of Target Location #1

136. **25 Chestnut Street, Apartment #2, Saugus, Massachusetts** is a multi-unit, three-story apartment complex with a main parking lot in front. The building is beige and green in color with white trim and two exterior balconies facing the parking lot. The main door faces the main parking lot, which has white pillars on each side of door. There is a fire call box to the right of

---

[3] In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991)(two year-old information relating to marijuana operation not stale)). As the First Circuit has explained "[b]y its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time." *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

the main door located on the building.  A detailed description of Target Location #1 appears in Attachment A, which is attached hereto and incorporated herein by reference.

137.     Based on physical and electronic surveillance and intercepted calls, I believe VICTORIA and Madelein Baez moved from 37 Skyline Drive to Target Location #1 in August 2016.  Since August 2016, investigators have seen VICTORIA going into and out of the apartment building located at 25 Chestnut Street, Saugus on numerous occasions at times of the day that confirm he lives at this location.  Moreover, the utilities assigned to Apartment #2 are in the name of Madelein Baez, VICTORIA's wife.  A detailed description of Target Location #1 is detailed in Attachment A, which is attached hereto and incorporated herein by reference.

<u>Link to Criminal Activity</u>

138.     As detailed in this Affidavit, VICTORIA is the leader of a DTO that purchases and distributes large quantities of heroin, cocaine, and Fentanyl to a large customer base.  VICTORIA has been intercepted discussing drug debts he owes to his suppliers and drug debts owed to him. VICTORIA and BLADI have also been intercepted discussing the value of gold jewelry they have purchased, presumably with drug proceeds.  Moreover, as detailed herein, VICTORIA has been intercepted using at least four different phones during the course of this investigation. Accordingly, I believe ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business, jewelry purchased with drug proceeds, and money are likely to be stored at Target Location #1.

139.     On August 21, 2016, VICTORIA called an unidentified male and asked if he could build a "little hide" in a new apartment that VICTORIA moving into.  This call was intercepted over Target Telephone #4.  I know from my training and experience that drug traffickers build hidden compartments inside their residences to store drugs and drug proceeds.  I believe

VICTORIA wanted to install a hidden compartment in his new residence to store drugs, drug proceeds, or other valuables, including jewelry.

140.    On numerous occasions throughout this investigation, investigators have seen VICTORIA leaving Target Location #1 prior to meeting customers who have ordered drugs, and returning to Target Location #1 after dealing drugs and collecting drug proceeds.  On November 1, 2016, investigators intercepted calls over Target Telephone #12 between VICTORIA and VEGA, which indicated that they were planning to meet later that evening.  At approximately 8:09 p.m., VEGA's nephew called VICTORIA and said he was at the Dunkin Donuts restaurant across the street from Target Location #1.  VICTORIA directed VEGA's nephew to come to Target Location #1.  An investigator conducting surveillance in the area of Target Location #1 at the time of this call saw a red Honda bearing Massachusetts registration 4AN 559 leave the Dunkin Donuts and drive into the parking lot of Target Location #1.  The vehicle was registered to Irene VEGA.   As detailed above, VEGA supplies cocaine to VICTORIA, and accordingly, I believe his nephew's visit to Target Location #1 was drug related.

141.    For approximately the past week, the precise location information for VICTORIA's phone (Target Telephone #12) indicates it has been at 6 Looney Avenue in Salem.  Calls intercepted over ISIDIRO's and BLADI's phones indicate that VICTORIA is hiding at that location, and that he has told people he has fled to the Dominican Republic to avoid being arrested in connection with the October 6, 2016 heroin seizure.  However, Madelein Baez is still residing at Target Location #1.

142.    Based on the investigation to date, VICTORIA's long-term involvement in drug trafficking, the fact that VICTORIA planned to install a hidden compartment inside of Target Location #1, and the money and drug seizures from members of his DTO during the course of

this investigation, I believe there is probable cause to believe that evidence of VICTORIA's ongoing drug trafficking activities, as set forth in Attachment B, will be found at Target Location #1.

### (2) BLADI's residence – Target Location #2

Description of Target Location #2

143.     **99 Glendower Road, Apartment 1** is a two-story, multi-family residence with light brown siding and white trim.  On the front porch, there are two doors.  The target door is white and on the right hand side with the numbers "99" in black attached to the door.  There is a glass storm door on the outside.

144.     Based on physical and electronic surveillance, precise location data for phones used by BLADI, and intercepted calls, I believe BLADI lives at Target Location #2 with his girlfriend, Wilcania Baez.  Investigators have seen BLADI coming in and out of Target Location #2 at times that are consistent with him living at that location.  Moreover, the utilities for Target Location #2 are in the name of Wilcania Baez.  BLADI has been seen at this location as recently as December 10, 2016.  A detailed description of Target Location #2 appears in Attachment A, which is attached hereto and incorporated herein by reference.

Link to Criminal Activity

145.     As detailed in this Affidavit, BLADI is the co-leader of a DTO that purchases and distributes large quantities of heroin, cocaine, and Fentanyl to a large customer base.  BLADI has been intercepted discussing drug debts he and VICTORIA owe to their suppliers and drug debts that are owed to them.  VICTORIA and BLADI have also been intercepted discussing the value of gold jewelry they have purchased, presumably with drug proceeds.  Moreover, as detailed herein, BLADI has been intercepted using at least three different phones during the course of this

investigation.  Accordingly, I believe ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business, jewelry purchased with drug proceeds, and money are likely to be stored at Target Location #2.

146.   On August 9, 2016, BLADI was intercepted over Target Telephone #3 giving the address to Target Location #2 to a drug customer named Wilson.  On October 29, 2016, VICTORIA gave the location to Target Location #2 DIAZ.   During that call, VICTORIA described the address as "possibly being #98," but confirmed that the house was on the right side of the street, had two doors, and that BLADI's door was on the right.  This is an accurate description of the location and appearance of Target Location #2.  As detailed herein, investigators seized $84,990 from DIAZ in November 2016 after he left Target Location #3.   I believe VICTORIA gave the address to Target Location #2 to DIAZ because DIAZ was either picking up drug proceeds or delivering drugs to Target Location #2.

147.   On November 4, 2016, BLADI was intercepted over Target Telephone #13 asking Wilcania Baez to remove his jewelry from the residence and conceal it at Wilcania Baez's mother's house.  BLADI was intercepted saying that he believed he saw surveillance units in the area of Target Location #8, which is believed to be his drug storage location.

148.   Investigators have intercepted calls between BLADI and VICTORIA in which VICTORIA directed BLADI to keep track of debts he and BLADI owed to their drug suppliers and debts that customers owed to them.

149.   Based on the investigation to date, BLADI's long-term involvement in drug trafficking, and the money and drug seizures from members of his DTO during the course of this investigation, and because Wilcania Baez continues to reside at Target Location #2, I believe there

is probable cause to believe that evidence of BLADI's ongoing drug trafficking activities, as set forth in Attachment B, will be found at Target Location #2.

**(3)**    **VICTORIA DTO Drug Storage Location – Target Location #3**

Description of Target Location #3

150.    **34 Broad Street, Apartment 24, Lynn, Massachusetts** ("34 Broad St") is a three-story, red brick multi-unit apartment complex.  The common entrance is located in the middle of the building located on Broad Street.  The front glass door leads to a vestibule area with an interior glass door.  The exterior has a gold #34 above the door.  A detailed description of Target Location #3 appears in Attachment A, which is attached hereto and incorporated herein by reference.

151.    Based on physical and electronic surveillance, precise location data for phones used by BLADI and VICTORIA, and intercepted calls, I believe VICTORIA, BLADI, and their criminal associates use Target location #3 to store and package drugs.  Precise location data for JANLE's phone indicated he was inside Target Location #3 as recently as December 9, 2016. Based on surveillance observations and intercepted calls, I believe JANLE is living at Target Location #3.  A detailed description of Target Location #3 appears in Attachment A, which is attached hereto and incorporated herein by reference.

Link to Criminal Activity

152.    In intercepted calls, VICTORIA and BLADI have discussed and coordinated their use of Target Location #3 to store drugs and drug proceeds.  Investigators have intercepted VICTORIA and BLADI referring to Target Location #3 as the "ranch."  Investigators have seen VICTORIA, BLADI, GORDO, MENOR, and JANLE at Target Location #3 at times that correspond to intercepted calls in which the Target Subjects coordinate the distribution of drugs to customers going to Target Location #3 to pick up drugs.  Based on intercepted calls and

surveillance observations, I believe JANLE maintains this drug stash location, maintains records of the drug distribution and money collection he conducts at this location, and also resides at Target Location #3.   Accordingly, I believe there is probable cause that evidence of the VICTORIA DTO's ongoing drug trafficking activities, as set-forth in Attachment B, will be found at Target Location #3.

153.   Since June 2016, investigators have seen VICTORIA, BLADI, GORDO, MENOR, and JANLE going into and out of 34 Broad Street.   For example, on July 6, 2016, pole camera footage showed VICTORIA, BLADI, GORDO, and MENOR meet on the front stoop and enter the building together.   On August 30, 2016, pole camera footage showed VICTORIA and BLADI entering the main entrance carrying bags; based on the content of intercepted calls between BLADI, VICTORIA, and their criminal associates, I believe these bags contained supplies for mixing and packaging drugs.   On September 17, 2016, VICTORIA was intercepted over Target Telephone #4 providing JANLE with the address for Target Location #3 and instructing him to go to Target Location #3 ("go up to 24") to conduct activities in furtherance of their conspiracy. As detailed above, JANLE has been intercepted numerous times discussing drug transactions with VICTORIA and the results of tests that were performed on heroin that VICTORIA was purchasing.

154.   On September 18, 2016, VICTORIA was intercepted providing the address to Target Location #3 ("34 Broad Street") to TORRES.   As detailed above, TORRES supplies heroin to VICTORIA.   On September 27, 2016, pole camera footage showed BLADI exiting the front door of the building carrying a small white bag and entering a vehicle believed to be operated NENE.   As detailed herein, NENE is a drug courier who often drives BLADI to pick up drugs and drug proceeds and to distribute drugs.

155.   As detailed above, on November 30, 2016, DIAZ was intercepted over Target Telephone #12 telling VICTORIA he was "coming up." Agents conducting surveillance observed a male, later determined to be DIAZ, arrive at Target Location #3 and later exit the building carrying a large box. Investigators followed DIAZ after he left Target Location #3, and recovered $84,990 from the vehicle DIAZ was driving during a subsequent car stop.

156.   As indicated above, on December 7, 2016, investigators conducted a car stop of NENE's Avalon. JANLE was with NENE at the time of the stop. JANLE and NENE were seen leaving Target Location #3 together prior to the car stop. The pole camera situated in the area of Target Location #12 showed that NENE's Avalon went to this location after leaving Target Location #3. Officers stopped NENE's Avalon after it had left Target Location #12. BLADI was intercepted discussing the car stop with VICTORIA. Based on the investigation to date and intercepted calls, I believe NENE and JANLE either delivered drugs to a customer named Pelon who lives at Target Location #12 or collected a drug debt from Pelon after the car stop.

157.   Based on the investigation to date, BLADI and VICTORIA's long-term involvement in drug trafficking, and the money and drug seizures from members of his DTO during the course of this investigation, I believe there is probable cause to believe that evidence of BLADI's ongoing drug trafficking activities, as set forth in Attachment B, will be found at Target Location #3.

**(4)    VINICIO's Residence – Target Location #4**

Description of Target Location #4

158.   **270 Malden Street, Revere, Massachusetts** is a beige, two-story multi-family house with a brick staircase leading to front porch. There are two doors on the porch. The target door is on the left hand side and is white. The glass storm porch door is on the outside. There is

a black mailbox to the left of the door, and the number 270 is located to the left of the door on the door casing.  A detailed description of Target Location #4 appears in Attachment A, which is attached hereto and incorporated herein by reference.

159.    I believe VINICIO resides at Target Location #4 because during the course of this investigation, and as recently as December 10, 2016, pole camera footage has captured VINICIO coming in and out of Target Location #4 on a daily basis at times indicating he resides there.

Link to Criminal Activity

160.    As detailed herein, investigators have intercepted two phones used by VINICIO during this investigation, both of which were used to conduct drug transactions.  Additionally, on October 2, 2016, investigators saw VINICIO walking out of Target Location #5 carrying four phones.  As detailed above, VINICIO supplies heroin and cocaine to VICTORIA and BLADI and to his own customer base.  Accordingly, I believe ledgers detailing drug transactions and drug debts, customer lists, phones used to conduct his drug business, drug proceeds, and other evidence of ongoing drug trafficking activities, as set forth in Attachment B, are likely to be stored at Target Location #4.

161.    Investigators have also seen VICTORIA and Madelein Baez entering and exiting Target Location #4.  Because VICTORIA and VINICIO have been intercepted discussing drug transactions, I believe that VICTORIA's presence at Target Location #4 is in furtherance of drug distribution.

162.    Moreover, on November 30, 2016, multiple text messages were intercepted over VICTORIA's phone (Target Telephone #12) between VICTORIA and SEPULVEDA, which indicated that VINICIO had asked SEPULVEDA to stop by 270 Malden Street to discuss drug

business with VINICIO. Location data from SEPULVEDA's phone on that same day at approximately 7:47 p.m. indicated that SEPULVEDA's phone was at Target Location #4.

163.   Based on the investigation to date, VINICIO's long-term involvement in drug trafficking, and the money and drug seizures from members of his DTO during the course of this investigation, I believe there is probable cause to believe that evidence of VINICIO's ongoing drug trafficking activities, including phones, ledgers, and records of drug transactions, as set forth in Attachment B, will be found at Target Location #4.

### (5)  **Pacific Auto – Target Location #5**

#### Description of Target Location #5

164.   **Pacific Auto, 221 Hancock Street, Dorchester, Massachusetts** purports to be a used car lot and is located at 221 Hancock Street, Dorchester, Massachusetts.  A large sign reading "Pacific Auto Sale" is displayed on a pole near the center of the fenced-in lot.  There is a mobile office trailer on the lot. The location to be searched includes the mobile office trailer and 29 cars that are parked in the fenced-in lot.  A detailed description of Target Location #5 appears in Attachment A, which is attached hereto and incorporated herein by reference.

165.   I believe VINICIO owns and operates Pacific Auto.  Significantly, pole camera footage has shown VINICIO at this location on a near daily basis.  The registered owner of Pacific Auto is Ramon Bernabel, which is a known alias used by Wilson Baez, who is VINICIO's brother. VINICIO has been intercepted telling BLADI and drug customers to come to this location for activities in furtherance of drug trafficking.

#### Link to Criminal Activity

166.   During the course of this investigation, investigators have seen VINICIO, VICTORIA, and BLADI at Target Location #5. VICTORIA was also intercepted calling the

landline for Pacific Auto and speaking to VINICIO.  I believe these meetings and calls were all related to their drug dealing businesses.

167.    For example, as detailed above, on August 17, 2016, VINICIO was intercepted telling BLADI to "pass by" to pick up a drug sample.

168.    In early September 2016, a cooperating witness ("CW")[4] working with the DEA told investigators that he/she had learned through a mutual contact that someone had recently robbed VINICIO of three kilograms of cocaine at gun point.  The CW was introduced to VINICIO by a mutual contact, who CW knew through his/her prior involvement in drug dealing.  Prior to this introduction, CW did not know VINICIO.  The CW reported that VINICIO wanted to hire someone to recover his stolen cocaine or its monetary equivalent. The CW also told investigators that VINICIO was interested in identifying persons who could launder drug money for him.  The CW told investigators that VINICIO and his brother (Wilson BAEZ) operate Pacific Auto, located at 221 Hancock Street, Dorchester, Massachusetts.  The CW further told investigators that VINICIO recently had given the CW a sample of drugs and told the CW to contact him if he/she knew of anyone interested in purchasing more.  VINICIO gave the sample to CW at Target Location #5.  The CW gave this sample to FBI agents, and the sample field tested positive for Fentanyl.  Based on information provided by this CW, intercepted calls discussing the stolen drugs, and VICTORIA's statement in an intercepted call that Pacific Auto is used to "deal our stuff" (as described in the paragraph that follows), I believe the drugs stolen from VINICIO were stolen from him at Target Location #5.

---

[4] Prior to 2014, the CW had provided information to the FBI, but was closed as an informant for a period of time due to lack of actionable information. The CW was reactivated in 2014 when he began providing information in the ongoing FBI investigation.  The CW has prior drug arrests, and one prior conviction for distributing drugs.  I believe that the information provided by the CW regarding the unrelated FBI investigation and on this investigation is reliable and credible.

169.    On September 21, 2016, investigators intercepted a call over Target Telephone #1 between VICTORIA and a drug customer who VICTORIA called SANTANA.  During the call, VICTORIA and SANTANA discussed that no cars were sold at Pacific Auto.  SANTANA said, "I don't like being there either.  You know they deal their stuff there.  It is very hot there." VICTORIA replied, "That's where they do everything buddy.  You heard?"  As detailed above, SANTANA told investigators that he believed VINICIO was selling drugs from Target Location #5.  I believe SANTANA and VICTORIA were talking about how VINICIO sells drugs from this location ("deal their stuff").

170.    On November 8, 2016, multiple calls were intercepted over VINICIO's phone (Target Telephone #16) between VINICIO and a customer named Mello.  Mello asked to purchase a "half dove," which I believed based on the investigation and other intercepted calls to be a reference to a half-ounce of cocaine.  VINICIO agreed to the sale and directed Mello to see Flaco, who is an employee at Pacific Auto, to pick up the cocaine.

171.    On November 30, 2016, pole camera footage showed VINICIO standing at the entrance of the Pacific Auto lot at approximately 10:30 a.m.  At approximately 10:34 a.m., a grey Ford Escape bearing Massachusetts registration 3GRG20 pulled into the lot, and an unidentified female got out of the car and approached VINICIO.  VINICIO and the woman made a quick hand-to-hand exchange before the female got back into her car and left.  During the brief exchange, the pole camera footage showed the female cupping an item in her right hand, which she appeared to give to VINICIO.  After the female got back into her car, another purported employee of Pacific Auto quickly approached the vehicle, removed his hand from his pocket, and leaned in through the front passenger window.  Based on my training and experience, I believe the female handed VINICIO money, and that another male handed her drugs after she got back into her car.

172.    As recently as December 10, 2016, investigators have conducted surveillance of Target Location #5 and observed that it is still being operated as "Pacific Auto," and we have intercepted no calls suggesting that the Target Subjects have stopped using Target Location #5 in furtherance of their criminal activity.   Based on the investigation to date, VINCIO's long-term involvement in drug trafficking, the apparent drug transactions witnessed by investigators, and the fact that VINICIO gave a CW a sample of Fentanyl at this location, I believe there is probable cause to believe that evidence of VINICIO's ongoing drug trafficking activities, as set forth in Attachment B, will be found at Target Location #5.

**(6)  ALAMO's Residence – Target Location #6**

Description of Target Location #6

173.    **12  Rock  Avenue,  Apartment  S1,  Swampscott,  Massachusetts** ("12  Rock Avenue") is a light brown, two story single family home with a two car garage underneath it.  The entrance is on right side of the house.   On the main level, there is a black mailbox on the stairway leading to the entrance.   The target entrance is a white door with a glass storm door on the right hand side of the house.   A detailed description of Target Location #6 appears in Attachment A, which is attached hereto and incorporated herein by reference.

174.    Investigators have observed ALAMO entering and exiting Target Location #6 at times and with the frequency that indicates he resides at this location, including in December 2016.   As recently as December 11, 2016, ALAMO was seen closing the mail box for Target Location #6 and entering the building.   The utilities for Target Location #6 are listed in the name of Clarissa Delacruz.   Delacruz is also the registered owner of the BMW X5 that investigators have seen ALAMO using.   Based on these facts, I believe that Clarissa Delacruz is ALAMO's girlfriend.

<u>Link to Criminal Activity</u>

175.     As detailed above, ALAMO has been intercepted numerous times ordering cocaine from VICTORIA.  Based on physical and electronic surveillance and intercepted calls (some of which are described in the paragraphs that follow), I believe ALAMO uses Target location #6 to conduct drug business.  Furthermore, because ALAMO was intercepted as recently as November 11, 2016, discussing the arrival of a drug load with VICTORIA, I believe ALAMO continues to distribute drugs and, therefore, that there is probable cause that evidence of ALAMO's ongoing drug trafficking activities, including phones used to conduct his drug business, ledgers documenting drug transactions and outstanding debts, drug proceeds, and other evidence set forth in Attachment B, will be found at Target Location #6.

176.     On May 26, 2016, investigators intercepted a call over Target Telephone #1 between VICTORIA and ALAMO, in which they arranged to meet later in the evening with a cocaine supplier.  After leaving the meeting, VICTORIA and ALAMO were intercepted talking about how their suspicions had been aroused by the meeting, and agreeing to return to Target Location #6 so they could check the undercarriages of their cars for GPS trackers.  After the call, footage from a pole camera in the vicinity of Target Location #6 showed VICTORIA and ALAMO at Target Location #6 using flashlights to examine underneath their vehicles.  I believe VICTORIA and ALAMO suspected that the cocaine supplier they met with placed GPS devices under their cars with the intention of robbing them at a later time.  Significantly, VICTORIA and ALAMO went to Target Location #6 to check their cars, evidencing their confidence that Target Location #6 is a safe place for them to act in furtherance of their criminal activity.

177.     On July 15, 2016, pole camera footage of Target Location #6 and its immediate vicinity showed VICTORIA arriving at Target Location #6 in his vehicle, removing a backpack

from the rear cargo area, and then walking toward Target Location #6.  Just prior to VICTORIA's

arrival, investigators had intercepted multiple calls over Target Telephone #1 between

VICTORIA and ALAMO in which VICTORIA told ALAMO he had purchased three kilograms

of cocaine, and ALAMO told VICTORIA he had customers available to purchase the cocaine.

Based on these intercepted calls and surveillance observations, I believe VICTORIA went to

Target Location #6 to deliver cocaine to ALAMO.

178.    As detailed above, ALAMO and VICTORIA were intercepted discussing a

shipment of drugs they were waiting to receive from the Dominican Republic on November 9,

2016.  I believe ALAMO told VICTORIA that the drug shipment had arrived and described the

drugs to VICTORIA in a call intercepted on November 11, 2016 (¶ 104).  In my training and

experience, I believe drug dealers who distribute the volumes of drugs that ALAMO and

VICTORIA keep and retain ledgers and detailed records of the drugs they purchase and sell.  I

further believe that ALAMO and VICTORIA likely store such ledgers and detailed records in

their residences.  Based on the investigation to date, ALAMO's long-term involvement in drug

trafficking, the intercepted calls about the shipment of drugs from the Dominican Republic, and

the apparent drug delivery witnessed by investigators, I believe there is probable cause to believe

that evidence of ALAMO's ongoing drug trafficking activities, as set forth in Attachment B, will

be found at #6.

**(7)  <u>NENE's Residence – Target Location #7</u>**

<u>Description of Target Location #7</u>

179.    **<u>41 Lindsey Street, Apartment 1, Dorchester, Massachusetts</u>** is a light green,

three story single family house.  There is a single white door entrance with the number "41" in

black on the right column leading up the stairs to a porch where the front door is located.  A

detailed description of Target Location #7 appears in Attachment A, which is attached hereto and incorporated herein by reference.

180.    I believe Target Location #7 is NENE's residence.  A GPS device attached to the black 2016 Toyota Avalon bearing MA LV66867 registered to Amable Diaz (NENE) at the address for Target Location #7 indicated that the vehicle consistently returned to and remained at this location in the nighttime between October 6, 2016, through October 26, 2016, and between December 2, 2016 and December 10, 2016.  As recently as December 2, 2016, investigators have seen the Toyota Avalon registered to NENE parked in the driveway of Target Location #7. Investigators frequently observed the same Avalon at Target Locations #2 and #3 picking up and dropping off BLADI and JANLE.   Moreover, the phone over which NENE was intercepted talking to BLADI is subscribed to in NENE's name (Amable Diaz) at this address.

Link to Criminal Activity

181.    As detailed above, NENE operates the Toyota Avalon as a livery vehicle and frequently drives BLADI to pick up and deliver drugs.  NENE has been intercepted numerous times discussing drug pickups with BLADI.  Furthermore, investigators have seen NENE and other Target Subjects going from Target Location #7 to drug deals, and the Target Subjects have been intercepted arranging to have jewelry stored at Target Location #7.  Accordingly, I believe there is probable cause that evidence of NENE's ongoing drug trafficking activities, including phones used to conduct his drug business, ledgers documenting customer's names and addresses, and other evidence set forth in Attachment B, will be found at Target Location #7.

182.    On October 6, 2016, after three kilograms of heroin were seized from VICTORIA, BLADI and VICTORIA were intercepted discussing whether VICTORIA would be arrested if law enforcement discovered the heroin that was hidden in his car.  In the same conversation,

BLADI told VICTORIA to take his "gold" from his home (Target Location #1) and bring it to NENE's (Target Location #7). VICTORIA agreed to do so. I believe BLADI told VICTORIA to relocate his gold (which I believe was purchased with drug proceeds) in order to avoid its seizure, and that BLADI advised VICTORIA to move the gold to Target Location #7 because VICTORIA believed Target Location #7 is a safe place to hide contraband from investigators. I further believe BLADI was at Target Location #7 on October 6, 2016 (the date on which three kilograms of heroin were seized from VICTORIA), because BLADI was intercepted using Target Telephone #5 to order food delivered to Target Location #7, and the location data for Target Telephone #5 indicated it was at Target Location #7 at the time.

183.    As detailed above, on December 7, 2016, NENE and JANLE were seen leaving Target Location #3, which I believe is a drug stash location, and traveling to Target Location #12, which I believe is the residence of a drug customer. My beliefs are based on intercepted calls, drug and money seizures, and surveillance. Therefore, I believe NENE continues to distribute drugs together with the other Target Subjects.

184.    Based on the investigation to date, NENE's ongoing involvement in drug trafficking, I believe there is probable cause to believe that evidence of NENE's ongoing involvement in the charged drug trafficking conspiracy, including phones used to conduct drug business, the names and addresses of customers, VICTORIA's jewelry, and other evidence set forth in Attachment B, will be found at Target Location #7.

**(8)  RUBIO's Residence – Target Location #8**

Description of Target Location #8

185.    **5050 Washington Street, Apartment 564, West Roxbury, Massachusetts** ("5050 Washington Street") is a three-story brown brick multi-unit complex with a common

entrance located in the middle of the building with glass doors leading into a vestibule.  The front glass door has the number "5050" on a blue awning over the front door.  "Hillview" is written on the front of the building to the right of the main entrance.  A detailed description of Target Location #8 appears in Attachment A, which is attached hereto and incorporated herein by reference.

186.    Based on surveillance and intercepted calls, I believe RUBIO resides at Target Location #8.  The utilities for Target Location #8 are in GORDO's name (Friman Gonzalez).  On numerous dates, investigators have seen RUBIO and GORDO entering and exiting the apartment complex at 5050 Washington Street and GORDO being picked up curbside by NENE.  On December 8, 2016, the precise location data for BLADI's phone indicated the phone was at Target Location #8.

<u>Link to Criminal Activity</u>

187.    As detailed above, GORDO is BLADI's brother, and he has been intercepted numerous times being directed by VICTORIA and BLADI to pick up drugs from suppliers and to deliver drugs to and pick up money from customers.  Investigators have seen RUBIO, BLADI, GORDO, and NENE at Target Location #8 during this investigation.  Based on intercepted calls, I believe BLADI uses Target Location #8 to store, mix, and package drugs.  Accordingly, I believe there is probable cause that evidence of BLADI's, GORDO's and RUBIO's ongoing drug trafficking activities, including phones used to conduct his drug business, ledgers documenting drug transactions and outstanding debts, drug proceeds and other evidence set forth in Attachment B, will be found at Target Location #8.

188.    On or about November 1, 2016, BLADI was seen leaving 5050 Washington Street and being picked up by NENE.  As detailed herein, based on surveillance and intercepted calls, I

believe NENE drives BLADI to deliver drugs to customers.  Accordingly, I think BLADI went to Target Location #8 to pick up drugs, which NENE then drove him to deliver.

189.    As detailed above, on November 2, 2016, a 911 call was placed requesting that an ambulance be sent to Target Location #8 (specifically to Apartment 564).  RUBIO was taken by paramedics from Target Location #8 to the hospital.  Based on this evidence and subsequent intercepted calls between GORDO and BLADI, and between RUBIO and BLADI, I believe RUBIO overdosed on heroin while in Target Location #8.

190.    On November 29, 2016, investigators parked a civilian vehicle equipped with a hidden camera in the vicinity of 5050 Washington Street.  The following afternoon, GORDO was intercepted over Target Telephone #17 talking to BLADI.  During the call, BLADI gave GORDO an accurate description of the vehicle with the hidden camera and told GORDO that he thought it was a law enforcement vehicle, including the fact that it had a state police sticker on the rear window.  BLADI told GORDO he was not going to leave Target Location #8 until the vehicle left.  I believe BLADI arrived at Target Location #8 and saw the vehicle, which he thought was a surveillance vehicle, and that he believed that Target Location #8 was might be under surveillance.  I further believe BLADI did not want to leave Target Location #8 because he believed he it was under surveillance and wanted to see if anyone got into the vehicle to confirm his suspicion.

191.    As such, I believe that probable cause exists to believe that evidence of ongoing drug trafficking activities, as set forth in Attachment B, will be located at Target Location #8.

**(9) SPEULVEDA's Residence – Target Location #9**

Description of Target Location #9

192.   **111 Eliot Road, Apt S1, Revere, Massachusetts** is a two-story, two-family side-by-side duplex style home with a brick front on the first story and white siding on the second level.  The front stairs lead to two doors, both of which are white in color and open inward.   The door to Target Location #9 is on the left.  A detailed description of Target Location #9 appears in Attachment A, which is attached hereto and incorporated herein by reference.

193.   The phone number listed with the billing records for utilities for Target Location #9 is (781) 437-2012, which is the same phone number that SEPULVEDA has been intercepted using to purchase drugs from VICTORIA.   As recently as December 8, 2016, a pole camera situated outside of 111 Eliot Road captured SEPULVEDA entering Target Location #9. Telephone records/intercepted calls show that SEPULVEDA remains in contact with VICTORIA, and their most recent contact was on November 30, 2016.

Link to Criminal Activity

194.   As detailed above, SEPULVEDA has been intercepted numerous times ordering large quantities of heroin from VICTORIA.  At times, VICTORIA has also purchased drugs from SEPULVEDA.  As detailed below, VICTORIA has been seen at this location after calls indicated that he was going to this location to deliver drugs proceeds to SEPULVEDA.   Accordingly, I believe there is probable cause that evidence of SEPULVEDA and VICTORIA's ongoing drug trafficking activities, including phones used to conduct his drug business, ledgers documenting drug transactions and outstanding debts, drug proceeds and other evidence set forth in Attachment B, will be found at Target Location #9.

195.   On October 5, 2016, investigators intercepted calls over Target Telephone #4 between VICTORIA and SEPULVEDA indicating that VICTORIA delivered $10,000 as payment of an outstanding drug debt to Target Location #9.   At 7:11 p.m., VICTORIA told

SEPULVEDA he would "stop by" SEPULVEDA's house.  At approximately 7:37 p.m., footage from a pole camera situated in the vicinity of Target Location #9 showed VICTORIA arriving in a vehicle and entering Target Location #9 carrying a bag.  VICTORIA returned to the vehicle at approximately 7:46 p.m. no longer carrying the bag.  At approximately 7:56 p.m., VICTORIA called SEPULVEDA and told him that he had left "10,000 pesos" for him.  SEPULVEDA asked for BLADI's number, saying that "that was more than a month ago," and he was "under pressure." At approximately 8:08 p.m., SEPULVEDA called VICTORIA and said that BLADI was "taking advantage of him."   SEPULVEDA told VICTORIA, "I owe you for your stuff from the other day.  And I have to pay you.  From that same money, I could have been able to pay you right away."   Based on the investigation and the intercepted calls, I believe VICTORIA brought SEPULVEDA $10,000 in the bag that he was carrying; that the money was a partial payment for drugs BLADI had purchased from SEPULVEDA on consignment; that SEPULVEDA complained that BLADI still owed him money; and that SEPULVEDA acknowledged he owed VICTORIA for drugs he had previously purchased ("your stuff.").

196.   Based on SEPULVEDA's continuous and recent involvement in the charged drug trafficking conspiracy, I believe that probable cause exists to believe that evidence of ongoing drug trafficking activities, as set forth in Attachment B, will be located at Target Location #9.

**(11)**     **JEFFERSON's Residence – Target Location #10**

Description of Target Location #10

197.   **1000 Loring Avenue,  Apartment C-91, Salem, Massachusetts** ("1000 Loring Avenue") is a brown nine-story brick apartment complex with a main entrance located in the center of the building, the front glass door leads to a vestibule area.  Apartment C-91 is on the

ninth floor.  A detailed description of Target Location #10 appears in Attachment A, which is attached hereto and incorporated herein by reference.

198.     I believe Target Location #10 is JEFFERSON's residence based on the evidence that follows.  A phone which JEFFERSON has been intercepted using numerous times to order drugs from VICTORIA is subscribed to in the name of Shirley Morales.  The lease and utilities for Target Location #10 are also in the name of Shirley Morales.  Moreover, JEFFERSON told VICTORIA in an intercepted call that he was currently on probation, and a clerk at the Essex County Superior Court confirmed that JEFFERSON is on probation.  Indeed, the phone number JEFFERSON has listed on his monthly probation form is the same phone number that he was intercepted using to order drugs from VICTORIA.  As recently as December 8, 2016, the location data for the phone JEFFERSON has been intercepted using indicated it was inside Target Location #10.

199.     I believe Target Location #10 is JEFFERSON's residence.  A phone which JEFFERSON has been intercepted using numerous times to order drugs from VICTORIA is subscribed to in the name of Shirley Morales.  The lease and utilities for Target Location #10 are also in the name of Shirley Morales.  Moreover, JEFFERSON indicated in an intercepted call with VICTORIA that he was currently on probation.  The Essex County Superior Court confirmed that JEFFERSON is on probation, and that he has listed on his monthly probation form the same phone number that he was intercepted using to order drugs from VICTORIA.  As recently as December 8, 2016, the location data for the phone JEFFERSON has been intercepted using indicated it was inside Target Location #10.

<u>Link to Criminal Activity</u>

200.    As detailed above, JEFFERSON has been intercepted numerous times over the course of several months – and as recently as December 1, 2016 – ordering large quantities of heroin and cocaine from VICTORIA.  In addition, investigators have seen VICTORIA coming and going from 1000 Loring Avenue after VICTORIA and JEFFERSON were intercepted on the phone arranging to meet one another in order that VICTORIA could distribute drugs to JEFFERSON. Accordingly, I believe there is probable cause that evidence of JEFFERON's ongoing drug trafficking activities, including phones used to conduct his drug business, ledgers documenting customer's names and addresses, and other evidence set forth in Attachment B, will be found at Target Location #10.

201.    On the afternoon of July 23, 2016, footage from a pole camera in the vicinity of 1000 Loring Avenue showed VICTORIA driving out of the complex in which Target Location #10 is located.  Later the same day, at approximately 10:06 p.m., investigators intercepted a call over Target Telephone #1 between VICTORIA and JEFFERSON in which JEFFERSON told VICTORIA he had tested the quality of drugs he had obtained from VICTORIA.   Based on this evidence and my investigation, I believe VICTORIA brought a sample of drugs to Target Location #10 for JEFFERSON to test, that JEFFERSON tested those drugs in Target Location #10, and that JEFFERSON called VICTORIA to report on the quality of the drugs.

202.    On September 15, 2016, at approximately 9:00 p.m., investigators intercepted calls between JEFFERSON and VICTORIA in which they arranged to meet at JEFFERSON's residence.  Footage from the pole camera outside of Target Location #10 showed VICTORIA exiting the apartment complex carrying a large bag later the same night.   Based on the investigation to date and the intercepted calls, I believe VICTORIA went to Target Location #10

to pick up money that JEFFERSON owed VICTORIA for drugs JEFFERSON had purchased on consignment.

203.    As detailed above, on November 8, 2016, at approximately 2:25 p.m. (session #1175), JEFFERSON called VICTORIA, and the call was intercepted over Target Telephone #12. VICTORIA asked if JEFFERSON was going to be "ready for today." JEFFERSON replied, "Um, no.  I am not ready but will have like 7,000."  VICTORIA said, "The thing is, I put my hand on the ten pesos.  I took them for myself and did not give anything to the guy because I am under pressure, you know?"  JEFFERSON replied, "No, it's alright.  I will give you seven or eight.  Let me see how much I can pick up . . . so you come see me with a dove, because I owe one for that kid from that same day.  You remember?"  VICTORIA said he remembered and was going to "remind" JEFFERSON.  JEFFERSON told VICTORIA, "I will give it to him now, and send me one, but you have to come and see me before 6:00, you hear me?"  VICTORIA agreed. JEFFERSON told VICTORIA he might have "7,000" for VICTORIA by 5:00 p.m., and asked VICTORIA to send "a dove" by that time.  VICTORIA agreed.  I believe JEFFERSON owed VICTORIA money for drugs he had purchased on consignment ("7,000"); that JEFFERSON asked VICTORIA to send him cocaine ("a dove") when VICTORIA went to pick up the money; and that VICTORIA told JEFFERSON he needed to collect the drug debt because he (VICTORIA) also owed a drug debt ("The thing is, I put my hand on the ten pesos.  I took them for myself and did not give anything to the guy because I am under pressure, you know?").  Based on prior intercepted calls and surveillance observations, I believe VICTORIA delivered the drugs to JEFFERSON at Target Location #10.

204.    JEFFERSON has been intercepted as recently as December 1, 2016 discussing drug distribution with VICTORIA.  Based on JEFFERSON's ongoing involvement in the charged drug

trafficking conspiracy, I believe that probable cause exists to believe that evidence of ongoing drug trafficking activities, as set forth in Attachment B, will be located at Target Location #10.

### (11) **JULIAN's Residence – Target Location #11**

Description of Target Location #11

205.    **24 Aberdeen Road, Apartment 1, Milton, Massachusetts** is a brown two-story multi-family structure, with a balcony in the front.   There is a single main entrance into the residence with a white storm door and a brown wood and glass door. A detailed description appears in Attachment A, which is attached hereto and incorporated herein by reference.

206.    I believe Target Location #11 is JULIAN's residence.   I believe Target Location #11 is JULIAN's residence.   A phone which JULIAN has been intercepted using ((857) 237-1659) numerous times to order drugs from VICTORIA is listed on the billing records for utilities for Target Location #11.   JULIAN's phone ((857) 237-1659) is still active, but it has been powered off since December 9, 2016.   It was most recently in contact with other Target Subjects on November 14, 2016.

Link to Criminal Activity

207.    Investigators have observed VICTORIA and BLADI at Target Location #11 on a number of occasions after intercepted calls indicated that they were going to Target Location #11 to deliver drugs.   Accordingly, I believe there is probable cause that evidence of JULIAN and VICTORIA's ongoing drug trafficking activities, including phones used to conduct his drug business, ledgers documenting drug transactions and outstanding debts, drug proceeds and other evidence set forth in Attachment B, will be found at Target Location #11.

208.    On May 26, 2016, investigators intercepted a call over Target Telephone #1 between VICTORIA and JULIAN.  VICTORIA told JULIAN he was heading towards JULIAN's

residence.  At approximately 10:37 a.m., VICTORIA called JULIAN and told him that he had arrived and asked JULIAN to open the door.  The location data for VICTORIA's phone indicated that it was at Target Location #11 at 10:40 a.m.

209.    As detailed above, on July 6, 2016, JULIAN called VICTORIA, and the call was intercepted over Target Telephone #1.  VICTORIA asked, "Do you mind if I send you the guy that I am training?"  JULIAN replied, "You are the one who has to bring him over and show him to me."  VICTORIA said he was not around.  JULIAN replied, "Send him over then."  VICTORIA said, "He is trustworthy . . . Listen, should I send you the two together or divided?  How should I send them?"  JULIAN told VICTORIA, "Bring me four of the best you got . . . I need the best."  Surveillance footage from the pole camera in the vicinity of 24 Aberdeen Road showed MENOR arriving at 24 Aberdeen Road at approximately 1:41 p.m. and entering Target Location #11.  As detailed above, JULIAN was intercepted ordering drugs from VICTORIA during the course of this investigation.  I believe MENOR brought drugs that JULIAN had ordered from VICTORIA.

210.    On October 7, 2016, at approximately 2:01 p.m., footage from the pole camera captured NENE's Toyota Avalon arrive at Target Location #11.  BLADI got out of the rear passenger seat and entered Target Location #11.  At approximately 2:04 p.m., BLADI exited Target Location #11 carrying a weighted duffle bag.  He got back into NENE's Toyota Avalon, and the car left the area.  Based on prior intercepted calls and this investigation, I believe BLADI went to Target Location #11 (JULIAN's residence) to deliver drugs and pick up money that JULIAN owed for drugs he had previously purchased, and that the money BLADI collected from JULIAN was in the weighted duffle bag that BLADI took from Target Location #11.

211.    On October 26, 2016, at approximately 1:42 p.m., electronic surveillance footage showed a car registered to Madeline Victoria (VICTORIA's wife) parked in front of Target

Location #11.   At 1:47 p.m., another vehicle arrived and parked in the driveway of Target Location #11.  At 1:51 p.m., VICTORIA was seen walking down the driveway of Target Location #11.  VICTORIA got into the car registered to Madeline VICTORIA, and the car drove away.

212.    VICTORIA was also seen at Target Location #11 on April 29, May 8, and May 16, 2016.

213.    Based on the investigation to date, JULIAN's long-term involvement in the charged drug trafficking conspiracy, and the long-standing and continued used of Target Location #11 by JULIAN and other Target Subjects, I believe there is probable cause to believe that evidence of JULIAN's ongoing drug trafficking activities, as set forth in Attachment B, will be found at Target Location #11.

### (12) **Pelon's Residence - Target Location #12**

#### Description of Target Location #12

214.    **161 Patriot Parkway, Revere, Massachusetts** is a multi-family, half brick half siding structure with a single main entrance into the residence.  The entrance is a white door with an outer glass storm door with two white lion statues in front. The target door is on the left side of the structure, down a driveway on the ground level.  Target Subjects have been seen using only this side door and not the main front door.  A detailed description of Target Location #12 appears in Attachment A, which is attached hereto and incorporated herein by reference.

215.    I believe Target Location #12 is the residence of a drug customer currently identified as "Pelon."  Based on intercepted calls between VICTORIA and WELLINGTON and between  VICTORIA and  BLADI,  Pelon  is  believed  to  be  WELLINGTON's  brother. Investigators have observed VICTORIA and Pelon going into and coming out of Target Location #12 on multiple dates since August 2016, and as recently as November 24, 2016.  Moreover, as

detailed herein, JANLE and NENE were both at Target Location #12 on December 7, 2016.  I believe Pelon lives at Target Location #12 because VICTORIA was seen at that location on October 5, 2016, at the same time that VICTORIA and Pelon were intercepted arranging for VICTORIA to deliver drugs to Pelon at his house.  Moreover, in other intercepted calls, VICTORIA and WELLINGTON agreed to meet at "Pelon's house."  Additionally, the location information for the phone Pelon used to order drugs from VICTORIA has consistently indicated it was inside of Target Location #12 as recently as December 10, 2016.  Pelon continues to be intercepted discussing drug distribution with VICTORIA, and was intercepted as recently as November 24, 2016.

<u>Link to Criminal Activity</u>

216.    On October 5, 2016, investigators intercepted calls over VICTORIA's phones (Target Telephones #4 and #8) between VICTORIA and Pelon, and between VICTORIA and WELLINGTON.  During the calls, the three Target Subjects arranged for VICTORIA to deliver "half a chicken."  Based on the investigation and other intercepted calls, I believe a "half a chicken" is a coded reference to a half kilogram of heroin.  At approximately 4:42 p.m., VICTORIA told WELLINGTON that no one was present to accept the delivery, and that VICTORIA was unable to get into the "beat up old car" in the driveway because the vehicle was locked. WELLINGTON instructed VICTORIA, "Put it there.  There's a swimming pool box." At approximately 4:46 p.m., VICTORIA called WELLINGTON back and said that he had left the package "inside the beach chair that's there."  VICTORIA further confirmed that two packages had been left, but that the package he left for Pelon was larger than the package VICTORIA had left for WELLINGTON.  Investigators went to the area after the intercepted calls in which VICTORIA said he was going to Pelon's house.  Officers saw VICTORIA arrive at Target

Location #12, walk behind the house, and then leave in his vehicle.  I believe VICTORIA left two packages of heroin, one for Pelon and one for WELLINGTON, in the rear of Target Location #12 ("inside the beach chair.").

217.    On November 16, 2016, at approximately 1:24 p.m. (session #1863), Pelon called VICTORIA, and the call was intercepted over Target Telephone #12.  Pelon told VICTORIA, "You told me you had something better from the abajo stuff.  Better than that, because I'm having complaints with the thing.  With those 95 that I have left."  VICTORIA said, "Let me check if there's some left.  Let me check."  Pelon replied, "Because they returned me like 30, and I have like 20 left and they are telling me their noses itch."  VICTORIA said, "I don't know.  Let me see if I can send you something there."  Pelon said, "Check, and try to send me at least 25 and see what can I do.  And to send you some money that I have from that."  I believe Pelon asked VICTORIA to exchange the heroin that he had purchased ("You told me you had something better from the abajo stuff.  Better than that, because I'm having complaints with the thing.") because his customers were complaining that the heroin was making their "noses itch"; that Pelon asked VICTORIA to send him 25 grams of heroin ("send me at least 25"); and that Pelon told VICTORIA he had money to give to VICTORIA for the heroin he had purchased on consignment ("And to send you some money that I have from that.").

218.    On November 21, 2016, at approximately 6:19 p.m., VICTORIA called Pelon, and the call was intercepted over Target Telephone #12.  VICTORIA said things were "tough" and asked Pelon, "Is your brother there?  He told me to stop by there.  That he was going to be there."  Pelon replied, "No, he has not arrived yet."  The pole camera footage in the vicinity of Target Location #12 showed VICTORIA arriving at the location at approximately 6:30 p.m.  I believe

VICTORIA went to Target Location #12 to collect money from WELLINGTON that WELLINGTON owed for drugs he had purchased.

219.    As indicated above, on December 7, 2016, investigators conducted a car stop of NENE's Toyota Avalon.  JANLE was with NENE at the time of the stop.  JANLE and NENE were seen leaving Target Location #3 together prior to the car stop.  The pole camera situated in the area of Target Location #12 showed that NENE's Toyota Avalon went to Target Location #12 after leaving Target Location #3.  Officers stopped NENE's Toyota Avalon after it left Target Location #12.  BLADI was intercepted discussing the car stop with VICTORIA.  Based on the investigation to date and intercepted calls, I believe NENE and JANLE either delivered drugs to Pelon at Target Location #12 or collected a drug debt from Pelon at that location.

220.    Accordingly, given the extensive and recent use of Target Location #12 by the Target Subjects, I believe that probable cause exists to believe that evidence of ongoing drug trafficking activities, as set forth in Attachment B, will be located at Target Location #12.

### (13) **TORRE's Residence - Target Location #13**

Description of Target Location #13

221.    **108 Lowell Road, Apartment 308, North Reading, Massachusetts** is an apartment building in the Edgewood Luxury Apartment community.  The neighborhood is located off of Route 62 in North Reading.  Building 108 is a three level wood framed residential building with tan siding and white trim.  The entrance to the target building is marked with a sign "BLDG 108 007-010 106-110 206-210 306-310."  This sign is located above the entrance. The entrance to the building is a blue door with a large glass center.  There are two full length windows on each side of the entry door.  The door opens outward with the door handle on the right side of the door.

222.     I believe Target Location #13 is the residence of TORRES.  Investigators have seen

TORRES coming and going from Target Location #13 at times that indicate he lives there.  The

precise location data for TORRES' phone consistently indicated it was at 108 Lowell Road

between November 30, 2016, and December 9, 2016.  As detailed below, TORRES was seen

leaving the building on November 9, 2016.  Investigators subpoenaed the list of residents of 108

Lowell Road, which revealed that Eulalia Sierra was the leasee for Target Location #13.  The

phone number listed as a contact phone number on the lease is (978) 601-6428.  This telephone

number was in contact with TORRES' phones, Target Telephones #10 and #14.  In addition,

investigators went to the leasing office, and the office confirmed that Charles TORRES is the

boyfriend of Eulalia Sierra and that he has paid the rent for Target Location #13 by money order.

The leasing agent was shown a photograph of TORRES, and leasing agent confirmed that the

person depicted in the photograph is the same person who paid the rent for Target Location #13

and is the boyfriend of Eulalia Sierra.  Based on this information, the fact that the precise data

location for TORRES' phone indicated it has been in this location, and the fact that TORRES has

been seen leaving this location, I believe TORRES resides at Target Location #13.

<u>Link to Criminal Activity</u>

223.     On November 9, 2016, investigators saw TORRES leave 108 Lowell Road carrying

a white bag, which TORRES placed into a black Jeep Grand Cherokee and then drove to a

Walgreens, located on Main Street in North Reading.  A short time later, another vehicle arrived

and TORRES received a call indicating that the person he was meeting had arrived.  Investigators

observed a male, later identified as Dannie Chee, exit the second vehicle, and enter TORRES'

vehicle, which then left the lot followed by the second vehicle.  The two vehicles drove down a

side street where it is believed that Chee exited TORRES' vehicle with the white bag and departed

in the second vehicle, which was followed by investigators.  As detailed above, investigators conducted a car stop of Chee's vehicle, and found a white bag containing $300,854 in the rear of Chee's vehicle.  Based on the investigation and calls intercepted before this meeting, I believe the bag that TORRES carried out of Target Location #13 contained $300,854 in drug proceeds, which TORRES gave to Chee to pay down a drug debt.

224.    As such, I believe that probable cause exists to believe that evidence of ongoing drug trafficking activities, including drug proceeds and cell phones used by TORRES during this investigation, and other evidence as set forth in Attachment B, will be located at Target Location #13.

## **CONCLUSION**

225.    Based on the information set forth above, I believe probable cause exists to conclude that the Target Subjects have conspired and continue to conspire to possess with intent to distribute, and to distribute, heroin, cocaine, and Fentanyl in violation of 21 U.S.C. §§ 841(a)(1) and 846, and that evidence of said criminal offenses, as set forth in Attachment B of each of the respective search warrant applications for the Target Locations, will be found inside each Target Location.

//

//

//

//

//

//

I, Mark G. Tully, having signed this Affidavit under oath as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information, and belief.

MARK G. TULLY
SPECIAL AGENT
DRUG ENFORCEMENT ADMINISTRATION

Subscribed and sworn to me this the 12th day of December 2016.

HONORABLE DAVID H. HENNESSY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS